[Crim. No. 18445. In Bank. Feb. 6, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT MARSHALL DISBROW, Defendant and Appellant.

**COUNSEL**

Albert D. Silverman, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Donald F. Roeschke, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

MOSK, J.—Defendant was charged in count I with the murder of Kathleen Pairis, and in count II with the murder of his wife Harriet. (Pen. Code, § 187.) It was further alleged that a firearm was used in the commission of both offenses. (Pen. Code, § 12022.5.) Following a jury trial defendant was found guilty on count II of murder in the second degree involving the use of a firearm. The jury was unable to reach a verdict on count I, and a mistrial was declared as to that charge. Thereafter defendant waived trial by jury on count I and the matter was submitted to the court on the transcript of the prior trial. The court adjudged defendant guilty of voluntary manslaughter, a lesser included offense, and found the allegation of use of a firearm to be true. Defendant's motion for new trial was denied and he was sentenced on each count to state prison for the term prescribed by law, the sentences to run concurrently. He appeals from the judgment (Pen. Code, § 1237), predicating error on the use of certain evidence to impeach his testimony at trial.

Defendant was separated from Harriet on March 21, 1973, after a marriage of only four months. On the afternoon of April 15, 1973, he drove to the home of Kathleen Pairis, one of Harriet's friends. He there confronted Kathleen, her mother Pernilla Blankenship, and other

members of the family, and demanded to be told the whereabouts of his estranged wife and two stepchildren. Mrs. Blankenship testified that defendant threatened to kill his wife and "anybody else that got in his way." He then left, but returned four or five times that day and repeated the threats.

The next evening defendant once more went to the Pairis home. In the living room at this time were Mrs. Blankenship, Harriet, Kathleen, two Pairis children and two Disbrow children. Mrs. Blankenship testified she heard a loud knock at the door and when she went to answer she saw defendant through a peephole. She advised Harriet not to open the door and began collecting the children and removing them to an adjoining bedroom.

While in the other room Mrs. Blankenship heard what she described as a "loud blam" and then the voice of Kathleen demanding that defendant leave.[1] She returned to the living room and saw defendant dragging Harriet by the hair with a pistol at her temple. Kathleen was also armed with a pistol. Mrs. Blankenship tried to intercede but defendant responded by pointing the gun at her. She pushed him away and defendant then directed his attention to Kathleen who was trying to call the police. There was a brief struggle over the telephone during which Mrs. Blankenship seized it and ran to the kitchen to make the call. She was unable to raise the operator and began searching for a knife. She then heard a single shot, a groan, followed by a flurry of gunshots, and ran to the bedroom to protect the children. She remained there until she heard a car drive away, then returned to the living room and discovered the bodies of Kathleen and Harriet.

On April 21, 1973, five days after the shooting, Deputy Sheriff Brown observed defendant sleeping in a bloodstained sleeping bag in his car. He inquired about the stains and defendant replied, "I'm shot in the legs. My name is Disbrow. I've been thinking about surrendering to you. I'm wanted for murder in Van Nuys." Defendant also said, "She shot me first." He had been shot five times.

Defendant was taken to a hospital for treatment. While being wheeled on a gurney from the emergency room he was interviewed by Detective Yost, who was surreptitiously taping the conversation on a concealed

---

[1] Apparently Kathleen voluntarily opened the door, as the police found no signs of forcible entry.

recorder. After being informed of his rights under the rule of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], defendant stated he wished to remain silent and consult an attorney. Yost, however, continued the interrogation, representing to defendant that any statements he made could *not* be used against him in court. Eventually, persuaded by these false assurances, defendant made certain inculpatory statements.

At trial defendant interposed a defense of self-defense, contradicting the testimony of Mrs. Blankenship and claiming he did not fire until after he had been shot by Kathleen.[2] Over defendant's objection portions of the inculpatory statements elicited at the hospital were admitted to impeach his testimony.[3] Defendant contends that the use of the illegally obtained statements as impeachment evidence constitutes reversible error.[4]

The People make no claim that defendant's statements to Detective Yost at the hospital were other than the product of an illegal police interrogation. *Miranda* made explicit the rule that a suspect's declaration of intention to remain silent and stand on his constitutional rights cannot thereafter be followed by additional questioning: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, *the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of *compulsion,* subtle or otherwise. Without the right to cut off

[2] Specifically, defendant denied threatening anyone on the afternoon of April 15, and said he went to the Pairis home only to tell his wife he was leaving town. He testified that he met Kathleen on the afternoon of the 16th and she told him to come to the house that evening to see his wife. He possessed the loaded gun in order to give it to one Ray Ward in return for a favor. He stated he was admitted to the Pairis home voluntarily and that the occupants appeared to be under the influence of something. Kathleen then allegedly pointed a gun at him and said, "Are you ready for this?" There followed a struggle over the gun and defendant was shot. He testified he then ran for the door, firing as he went, and did not know he had hit anyone until he heard it on the car radio.

[3] On cross-examination defendant was questioned concerning three statements made to Detective Yost which conflicted with his trial testimony. The first was that he went to the Pairis home to get money to leave town, and that the only way he could get the money was with a gun. The second statement concerned the location of the principals at the time defendant was shot. The third statement concerned defendant's specific recollection of shooting his wife. These statements were then reintroduced when Detective Yost testified in rebuttal.

[4] Because of our disposition herein we find it unnecessary to reach defendant's remaining contentions.

questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (Fn. omitted; italics added.) (*Miranda* v. *Arizona* (1966) *supra,* 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 723].) Given the tainted nature of defendant's statements to Detective Yost, it is clear they are inadmissible as part of the prosecution's case in chief. (*Id.,* at p. 479 [16 L.Ed.2d at pp. 726-727]; *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625].) The question is whether the statements may be used to impeach defendant's testimony.

In *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], the Supreme Court held that statements which were inadmissible as affirmative evidence because of a failure to comply with *Miranda* could nevertheless be used for impeachment purposes to attack the credibility of a defendant's trial testimony, as long as the statements were not "coerced" or "involuntary." The court dismissed language to the contrary in *Miranda* as dictum (*id.,* at p. 224 [28 L.Ed.2d at pp. 3-4])[5] and concluded, "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (*Id.,* at p. 226 [28 L.Ed.2d at p. 5].)

In *People* v. *Nudd* (1974) 12 Cal.3d 204, 208 [115 Cal.Rptr. 372, 524 P.2d 844], a bare majority of this court "adopted" the *Harris* rationale as the law in California. The defendant in *Nudd* was an inmate at a state correctional facility who was charged with possession of narcotics. A guard had surprised the defendant while the latter was holding narcotics, and after a brief scuffle some material was flushed down the cell toilet. Informed of his *Miranda* rights the defendant chose to remain silent. He was then invited to speak "off the record" and finally admitted that while

---

[5]The *Miranda* language was as follows: "The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. *In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication.* These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." (Italics added.) (384 U.S. at pp. 476-477 [16 L.Ed.2d at p. 725].)

he liked the officer a struggle was necessary in order to dispose of the contraband. At trial the defendant denied every allegation in the People's case, and the "off the record" admission was introduced to impeach his credibility. No limiting instruction was requested or given, and hence the jury were presumably free to consider the illegally obtained confession as substantive evidence.[6]

In the present case we reexamine *Nudd* and its uncritical acceptance of the *Harris* rationale. A useful starting point in this inquiry is the authority relied on in *Harris* itself, i.e., the general availability of an "impeachment exception" to exclusionary rules.

An exclusionary rule analogous to *Miranda* is predicated on the Fourth Amendment's proscription of unreasonable searches. (*Weeks* v. *United States* (1914) 232 U.S. 383 [58 L.Ed. 652, 34 S.Ct. 341].) The first case in which an impeachment exception to the *Weeks* exclusionary rule was claimed was *Agnello* v. *United States* (1925) 269 U.S. 20 [70 L.Ed. 145, 46 S.Ct. 4, 51 A.L.R. 409], and there the argument was unavailing. The defendants in *Agnello* were charged with conspiracy to sell cocaine in violation of the Harrison Act. Following their arrest narcotics officers had conducted a warrantless search of defendant Agnello's home and there found a can of cocaine. At trial this evidence was excluded under *Weeks* but the prosecution proceeded on the strength of other, legally seized evidence. On cross-examination Agnello stated he had never seen narcotics. He was then asked if he had ever seen the can of cocaine, to which he responded in the negative. In rebuttal, over defense objection, the government was permitted to introduce the can illegally seized from Agnello's bedroom.

The Supreme Court reversed, holding the can to be the product of an illegal search, admissible neither as part of the case in chief nor as rebuttal evidence: "[T]he contention that the evidence of the search and seizure was admissible in rebuttal is without merit. In his direct examination, Agnello was not asked and did not testify concerning the can of cocaine. In cross-examination, in answer to a question permitted over his objection, he said he had never seen it. He did nothing to waive his constitutional protection or to justify cross-examination in respect of

---

[6]The lack of a limiting instruction was held not to be error: "Granted, even though not requested to do so, the trial court must instruct the jury on the general principles of law raised by the evidence. [Citations.] But absent request by a party, there is no duty to give an instruction limiting the purpose for which evidence may be considered." (12 Cal.3d at p. 209.)

the evidence claimed to have been obtained by the search. As said in *Silverthorne Lumber Co.* v. *United States* . . . [251 U.S. 385 (64 L.Ed. 319, 40 S.Ct. 182, 24 A.L.R. 1426)], 392, 'The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.' " (269 U.S. at p. 35 [70 L.Ed. at p. 150].)

In *Walder* v. *United States* (1954) 347 U.S. 62 [98 L.Ed. 503, 74 S.Ct. 354], a decision relied on in *Harris,* a limited exception to the *Agnello* rule was devised. Walder was charged in 1952 with sale of narcotics. Two years earlier a separate, unrelated narcotics indictment against him had been dismissed on the ground that the evidence forming the basis of the prosecution—a capsule of heroin—was the product of an illegal search. In the 1952 trial Walder made the broad assertion on direct examination that "I have never sold narcotics to anyone in my life" and further had never possessed narcotics. After he reiterated these claims on cross-examination, the government was permitted to question him concerning the seizure of the heroin capsule in his home in 1950.

The Supreme Court affirmed, declaring in a now well-worn passage, "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment." (347 U.S. at p. 65 [98 L.Ed. at p. 507].)

The court was careful, however, to reaffirm the integrity of *Agnello,* stating, "There the Government, after having failed in its efforts to introduce the tainted evidence in its case in chief, tried to smuggle it in on cross-examination by asking the accused the broad question, 'Did you ever see narcotics before?' . . . In holding that the Government could no more work in this evidence on cross-examination than it could in its case in chief, the Court foreshadowed, perhaps unwittingly, the result we reach today . . . ." (*Id.,* at p. 66 [98 L.Ed. at p. 507].)[7]

---

[7] The *Walder* court also made clear that if the defendant had merely denied possession of the heroin which was the basis of the prosecution, no impeachment would have been permitted: "the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief." (*Id.,* at p. 65 [98 L.Ed. at p. 507].)

As noted, *Harris* was based on the *Walder* holding, but *Agnello* was not cited therein. In *Harris* the defendant was charged with two counts of heroin sale to an undercover officer. At trial the defendant testified that no sale took place on one of the dates specified in the indictment and that on the other date he sold only baking powder under a scheme to defraud the purchaser. On cross-examination the defendant was questioned about certain statements made to police, after defective *Miranda* warnings, which "partially contradicted [his] direct testimony at trial." (401 U.S. at p. 223 [28 L.Ed.2d at p. 3].) Both counsel then referred to the substance of the statements during closing argument and the defendant was convicted on the second count.[8]

The Supreme Court affirmed, noting that "In *Walder* . . . the Court permitted physical evidence, inadmissible in the case in chief, to be used for impeachment purposes." (*Id.*, at p. 224 [28 L.Ed.2d at p. 4].) With regard to the contention that *Walder* was inapposite since it represented only a narrow exception—not present in *Harris*—to the general rule of *Agnello*, the court said, "It is true that Walder was impeached as to collateral matters included in his direct examination, whereas petitioner here was impeached as to testimony bearing more directly on the crimes charged. We are not persuaded that there is a difference in principle that warrants a result different from that reached by the Court in *Walder*. Petitioner's testimony in his own behalf concerning the events of January 7 contrasted sharply with what he told the police shortly after his arrest. The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." (*Id.*, at p. 225 [28 L.Ed.2d at p. 4].)

The final case in this series is *People* v. *Taylor* (1972) 8 Cal.3d 174 [104 Cal.Rptr. 350, 501 P.2d 918]. There this court considered the net effect of the *Agnello-Walder-Harris* line of decisions in the context of impeachment by use of the fruits of a prior, unrelated, illegal search. After a detailed analysis we concluded that evidence of the prior possession of

---

[8] It is interesting to note that in neither *Harris* nor *Nudd* was the traditional safeguard against improper use of impeachment evidence, the limiting instruction, of any effect. In *Harris* both sides argued the substance of the statements, and in *Nudd* no limiting instruction was given. (See fn. 6, *ante.*)

narcotics may be used only if the defendant, *on direct examination,* makes the sweeping claim that he has never dealt in or possessed any narcotics. We thus read *Agnello-Walder* in a considerably more restrictive fashion than did the court in *Harris.* (*Taylor,* at p. 182 of 8 Cal.3d; see Comment, *The Impeachment Exception to the Constitutional Exclusionary Rules* (1973) 73 Colum.L.Rev. 1476, 1483-1491.)

Similarly, in the instant case we are not convinced that *Walder* supports the proposition that statements elicited in violation of *Miranda* may generally be used to impeach. Rather we read *Walder* as reiterating the primary rule of exclusion enunciated in *Agnello,* absent the peculiar and limited circumstances shown in *Walder* and discussed in *Taylor.* Accordingly, we must look elsewhere than to an analogy to search and seizure law if support is to be found for the *Harris-Nudd* rule.[9]

*Miranda* itself will not provide this support. Even aside from the strong dictum in that opinion demonstrating that illegally obtained confessions should not be used for *any* purpose (see fn. 5, *ante*), there are compelling reasons to disregard *Nudd* contained in the *ratio decidendi* of *Miranda.*

Prior to *Miranda* state courts were barred by the Fifth and Fourteenth Amendments from admitting into evidence confessions that were "involuntary." (*Brown* v. *Mississippi* (1936) 297 U.S. 278 [80 L.Ed. 682, 56 S.Ct. 461].) "Under this test, the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was 'free and voluntary: that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . .' " (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 7 [12 L.Ed.2d 653, 659, 84 S.Ct. 1489], quoting *Bram* v. *United States* (1897) 168 U.S. 532 [42 L.Ed. 568, 18 S.Ct. 183].) This test, as it developed, spawned multiple categories identifying impermissible interrogatory practices, many being more subtle than traditional notions of coercion. For example, in *Haynes* v. *Washington* (1963) 373 U.S. 503 [10 L.Ed.2d 513, 83 S.Ct. 1336], a

---

[9]Of course, we do not presume to interpret the above-discussed federal decisions in a manner contrary to that established by the United States Supreme Court as a matter of *federal* law. We discuss these cases only in order to determine whether under *state* law they are persuasive authority for interpreting California cases such as *Fioritto* and *Taylor* to furnish justification for an impeachment exception to the self-incrimination clause of article I, section 15, of the California Constitution. In short, our decision herein is not based on a different reading of *Agnello-Walder,* but rather a different view of the parameters of the independent state self-incrimination clause.

determination of involuntariness was predicated on the refusal to allow a suspect to call his wife until he confessed, and in *Spano* v. *New York* (1959) 360 U.S. 315, 323 [3 L.Ed.2d 1265, 1271-1272, 79 S.Ct. 1202], "sympathy falsely aroused" rendered inadmissible the resultant statements. We do not reflect adversely on those decisions but merely recognize the increased sophistication of the concept as it progressed from its roots in the brutal torture practiced in *Brown.*

In *People* v. *Fioritto* (1968) *supra,* 68 Cal.2d 714, 717, we said, "A principal objective of [*Miranda*] was to establish safeguards that would liberate courts insofar as possible from the difficult and troublesome necessity of adjudicating in each case whether coercive influences, psychological or physical, had been employed to secure admissions or confessions." The precision with which the *Miranda* court established not simply broad procedural guidelines but a precise manual for the conducting of custodial interrogations can be interpreted only as expressing an intention to create a single, uncomplicated, universally applicable test for determining whether a particular confession was coerced. If proper warnings are given voluntariness is assured, at least in the absence of evidence of "traditional" coercion.[10] Conversely, if an accused is inadequately informed of his rights involuntariness is assumed, and the statements are inadmissible at trial.

The *Harris-Nudd* rule would resurrect the remains of the earlier voluntariness test. Neither case by its terms would allow impeachment by use of statements which are "coerced or involuntary." (*Harris,* at p. 224 of 401 U.S. [at pp. 3-4 of 28 L.Ed.2d]; *Nudd,* at p. 209 of 12 Cal.3d.) Thus under *Harris-Nudd* the following scenario can be anticipated: a defendant will testify in a manner the prosecution considers contrary to his extrajudicial statement. The defendant will contend that the statement is involuntary under one of the myriad pre-*Miranda* definitions of that term. It will then be necessary to interrupt the proceedings, not only at mid-trial but at mid-examination, for an evidentiary hearing, the outcome of which will be subject to later review on appeal. Only if the statement is ruled voluntary will it be admissible to impeach. In time there will arise an impressive body of law on the voluntariness issue, rivaling that which presently exists in the area of search and seizure, as various appellate courts grapple on a case-by-case basis with the question

---

[10] For example, the giving of proper warnings would obviously not render a confession voluntary if the warnings were followed by a physical beating.

of what is an involuntary statement.[11] This, we feel, is precisely the evidentiary thicket *Miranda* was designed to avoid.[12]

■ However, our principal objection to the *Harris-Nudd* rule lies in the considerable potential that a jury, even with the benefit of a limiting instruction, will view prior inculpatory statements as substantive evidence of guilt rather than as merely reflecting on the declarant's veracity. The theory of a limiting instruction loses meaning in this context. It is to be recalled that we are here dealing with extrajudicial *inculpatory* admissions. To instruct a jury that they are not to consider expressions of complicity in the charged crime as evidence that the speaker in fact committed the charged crime, but only for the purpose of demonstrating that he was probably lying when he denied committing the charged crime, would be to require, in the words of Learned Hand, "a mental gymnastic which is beyond, not only [the jury's] power, but anybody else's." (*Nash* v. *United States* (2d Cir. 1932) 54 F.2d 1006, 1007.) It is thus clear that a defendant faced with the prospect of the jury hearing his admittedly illegally obtained confession if he testifies in his own behalf will be under considerable pressure to forego this most basic right of an accused. Such a result is certainly not what *Miranda* envisaged.

---

[11]The immense tax on judicial resources flowing from a rule requiring questions of voluntariness to be decided on a case-by-case basis is indicated by Justice Tom Clark's dissent in *Haynes:* "In light of petitioner's age, intelligence and experience with the police, in light of the comparative absence of any coercive circumstances, and in light of the fact that petitioner never, from the time of his arrest, evidenced a will to deny his guilt, I must conclude that his written confession was not involuntary. I find no support in any of *the 33 cases decided on the question by this Court* for a contrary conclusion." (Italics added.) (*Haynes* v. *Washington* (1963) *supra,* 373 U.S. 503, 525 [10 .L.Ed.2d 513, 527-528] (Clark, J., dissenting).)

[12]Indeed, there is an unsettled question of voluntariness in the case at bar: is police deception tantamount to physical or psychological coercion? *Miranda* stated, "any evidence that the accused was . . . tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." (384 U.S. at p. 476 [16 L.Ed.2d at p. 725].) But *Miranda* was not primarily concerned with questions of traditional coercion. It is clear that deceit coupled with overbearing practices will render a confession involuntary. (*Leyra* v. *Denno* (1954) 347 U.S. 556 .[98 L.Ed. 948, 74 S.Ct. 716].) However, there is also authority that deceit alone is not coercive. (*People* v. *Atchley* (1959) 53 Cal.2d 160 [346 P.2d 764]; but see *Atchley* v. *Wilson* (N.D.Cal. 1968) 300 F.Supp. 68.) In *People* v. *Johnson* (1969) 70 Cal.2d 469 [74 Cal.Rptr. 889, 450 P.2d 265], an assurance given the defendant that the statements taken were only for "investigatory" purposes was partly responsible for a finding of involuntariness, but in that case there was evidence of other threats and promises. Conversely, in *Nudd* the statements were held voluntarily made, but there was some question whether the defendant had realized that the officer was giving him the opportunity to speak "off the record." We note these cases to illustrate the potential morass which lurks behind a seemingly straightforward question of voluntariness. Fortunately, in view of our disposition of this case we find it unnecessary to add yet another appellate consideration of the effect of deceit under the "totality of circumstances" test.

Furthermore, to permit admissibility leaves little or no incentive for police to comply with *Miranda's* requirements. If an officer may falsify the warning concerning the admissibility of statements, as in the case at bar, other warnings may be similarly inverted or retracted. The police, for example, may inform an accused that he has no right to remain silent and no right to counsel. In a case of notoriety with little independent evidence there may be irresistible pressures on law enforcement personnel to secure a confession. If it is known that statements elicited in violation of *Miranda* may nevertheless be introduced at some point in the trial there would exist no sanction whatever against the use of overbearing interrogatory techniques, at least until the practices approached traditional levels of coercion.

In addition to the likelihood that police misconduct may be encouraged by *Harris,* we are further convinced of the impropriety of receipt of this evidence by a significant rationale of the exclusionary rule itself. In *People* v. *Cahan* (1955) 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513], the landmark case in which this court adopted the rule for California two decades ago,[13] we said, "the success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. . . . Out of regard for its own dignity as an agency of justice and custodian of liberty the court should not have a hand in such 'dirty business.' " In the case at bar, accordingly, exclusion of the statements illegally extracted from defendant by Detective Yost would "relieve the courts from being compelled to participate in such illegal conduct." (*Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 156 [98 Cal.Rptr. 649, 491 P.2d 1].)

We therefore hold that the privilege against self-incrimination of article I, section 15, of the California Constitution precludes use by the prosecution of any extrajudicial statement by the defendant, whether inculpatory or exculpatory, either as affirmative evidence or for purposes of impeachment, obtained during custodial interrogation in violation of the standards declared in *Miranda* and its California progeny. Accordingly, we overrule *Nudd* and declare that *Harris* is not persuasive authority in any state prosecution in California.[14]

We are not the first court to reject *Harris* on state constitutional grounds. In *State* v. *Santiago* (1971) 53 Hawaii 254 [492 P.2d 657], the

---

[13]This was, of course, six years prior to the United States Supreme Court decision in *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933].

[14]Doubtless official reliance has heretofore been placed on both *Harris* and *Nudd.* Accordingly, except as to the defendant in the case at bar the rule we now adopt will apply only to trials begun after this opinion becomes final.

Supreme Court of Hawaii, relying exclusively on the self-incrimination clause of that state's Constitution, declared that statements of the defendant elicited without compliance with *Miranda* or "equally effective protections" cannot be used as impeachment evidence. The court recognized the competing policy considerations but concluded, "We, like the writers of the *Harris* majority opinion and the opinions following *Harris*, are reluctant to allow a defendant to take the stand and testify in contradiction to statements made during custodial interrogation . . . . Our system of government, however, maintains a countervailing value of protecting the accused's privilege to freely choose whether or not to incriminate himself . . . To convict a person on the basis of statements procured in violation of his constitutional rights is intolerable. The prosecutor's argument that he had a right to impeach the defendant with statements made in the absence of *Miranda* warnings cannot, under the [state] constitution, be sustained." (Fn. omitted.) (*Id.*, at pp. 664-665.)

Other courts, while not specifically resting on separate constitutional grounds, have continued to adhere to pre-*Harris* authority. In *United States* v. *Jordan* (1971) 20 U.S.C.M.A. 614 [44 C.M.R. 44], the United States Court of Military Appeals held that *Harris* did not operate to dispense with the requirement in the Manual for Courts-Martial that *Miranda*-type warnings be given as a prerequisite to the use of statements for any purpose: "Because Manual warning standards were not met, use of Jordan's incriminating pretrial statements for impeachment [purposes] was prejudicially improper." (*Id.*, at p. 47.) Similarly, in *Butler* v. *State* (Tex.Crim. 1973) 493 S.W.2d 190, the Texas Court of Criminal Appeals concluded that *Harris* did not override a Texas statutory scheme which provided that oral confessions elicited from a suspect while in custody were unreliable and inadmissible except in narrowly defined circumstances: " '*Harris*, of course, in no way obligates [state courts] to overturn prior decisions as a matter of state criminal procedure.' . . . Therefore we cannot agree with the State's contention despite the natural temptation to rush to accept the *Harris* rationale. The beauty is only skin deep." (*Id.*, at p. 198, quoting from Note (1971) 49 Texas L.Rev. 1119, 1125.)[15]

■ We pause finally to reaffirm the independent nature of the California Constitution and our responsibility to separately define and

---

[15]Academic reaction to *Harris* has in general been strongly critical. (See, e.g., Dershowitz & Ely, *Harris v. New York: Some Anxious Observations* (1971) 80 Yale L.J. 1198; Note, *Harris v. New York: the Retreat from Miranda* (1972) 32 La.L.Rev. 650; Note (1971) 40 Fordham L.Rev. 394; Note (1972) 85 Harv.L.Rev. 44; Note (1971) 24 Vand.L.Rev. 843; Note (1971) 39 Geo.Wash.L.Rev. 1241; Note (1973) 73 Colum.L.Rev. 1476.)

protect the rights of California citizens despite conflicting decisions of the United States Supreme Court interpreting the federal Constitution. Indeed, the United States Supreme Court has recently characterized this proposition as "good law" in reviewing a sister state court's application of *Harris.* (*Oregon* v. *Hass* (1975) 420 U.S. 714, 719, fn. 4 [43 L.Ed.2d 570, 576, 95 S.Ct. 1215].) Justice Brennan added in his dissent in *Michigan* v. *Mosley* (1975) 423 U.S. 96, 120 [46 L.Ed.2d 313, 331-332, 96 S.Ct. 321], that in light of recent "erosion of *Miranda* standards as a matter of federal constitutional law, it is appropriate to observe that no State is precluded by the decision from adhering to higher standards under state law. Each State has power to impose higher standards governing police practices under state law than is required by the Federal Constitution. See *Oregon* v. *Hass,* 420 U.S. 714, 719 (1975); *Lego* v. *Twomey,* 404 U.S. 477, 489 (1972); *Cooper* v. *California,* 386 U.S. 58, 62 (1967). A decision particularly bearing upon the question of the adoption of *Miranda* as state law is *Pennsylvania* v. *Ware,* 446 Pa. 52, 284 A.2d 700 (1971). . . . Understandably, state courts and legislatures are, as matters of state law, increasingly according protections once provided as federal rights but now increasingly depreciated by decisions of this Court. See, *e.g., State* v. *Santiago,* 53 Haw. 254, 492 P.2d 657 (1971) (rejecting *Harris* v. *New York, supra*); *People* v. *Beavers,* 393 Mich. 554, 227 N.W.2d 511, cert. denied, 44 U.S.L.W. 3206 (1975) (rejecting *United States* v. *White,* 401 U.S. 745 (1971)); *State* v. *Johnson,* 44 U.S.L.W. 2196 (N.J., Nov. 4, 1975) (rejecting *Schneckloth* v. *Bustamonte,. supra*); *Commonwealth* v. *Campana,* 455 Pa. 622, 314 A.2d 854, cert. denied, 417 U.S. 969 (1974) (adopting 'same transaction or occurrence' view of Double Jeopardy Clause)." (Fn. omitted.)

In *People* v. *Brisendine* (1975) 13 Cal.3d 528, 548-552 [119 Cal.Rptr. 315, 531 P.2d 1099], we conducted an extended analysis of the question and concluded that "the California Constitution is, and always has been, a document of independent force." We do not propose to repeat that discussion here except to note that we continue to adhere to the views expressed therein, and apply them in the case at bar.

██ Because the illegally obtained statements tended to establish that defendant went to the Pairis home in order to use the gun to obtain money, and also that defendant actually shot the victims, they amount to a virtual confession of the charged crime and negation of his trial claim of self-defense. (*People* v. *Powell* (1967) 67 Cal.2d 32, 51-52 [59 Cal.Rptr. 817, 429 P.2d 137].) "It is settled that the introduction of a confession obtained from a defendant in violation of constitutional guarantees is

prejudicial per se and requires reversal regardless of other evidence of guilt." (*People* v. *Fioritto* (1968) *supra,* 68 Cal.2d 714, 720.)

The judgment is reversed.

Tobriner, J., and Sullivan, J., concurred.

**WRIGHT, C. J.**—I concur. As I joined the majority in *People* v. *Nudd* (1974) 12 Cal.3d 204 [115 Cal.Rptr. 372, 524 P.2d 844], which was filed on July 31, 1974, and I now join the majority in overruling that opinion, I believe a brief explanation of my change in position on the principal issue raised in *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] is warranted. When I signed *Nudd* I was motivated primarily by my abhorrence of the possibility of perjured testimony although as a long-time trial judge I well recognized that defendants in criminal actions were prone to commit a "little" perjury when their life or liberty was at stake. I, of course, did not condone such conduct. Further, I could not at that time conceive that evidence obtained in incidents such as the present flagrant violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] and *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625] would ever be presented to a trier of fact. *Miranda* articulates a sound and workable exclusionary rule which is still the law of this land. I now recognize that rule is eviscerated when police officers can ignore the duty to give the warnings or, as in the instant case, violate *Miranda* and *Fioritto* requirements knowing full well that the illegally obtained statements may be admissible for impeachment purposes if a defendant elects to testify.

Moreover, as the majority opinion so convincingly sets forth, adherence to *Harris* and *Nudd* will force revival of numerous, elusive tests of voluntariness to determine if statements obtained in violation of *Miranda* are admissible or inadmissible for purposes of impeachment. A host of appellate opinions on this imprecise test would soon be spawned. *Miranda* eliminated the need for such inquiries and I believe that salutary effect should not be thwarted.

Finally, I find that fundamental fairness to individuals accused of the commission of a public offense demands that *Harris-Nudd* be rejected. Regardless of the precision of instructions limiting the trier of fact to consideration of the illegally obtained statements solely for impeachment purposes, it is simply unrealistic to believe that such statements will not

be considered by the trier of fact as substantive evidence of guilt. I now recognize that this manifestly prejudicial and unfair use of the illegally obtained evidence would transform *Miranda* into a rule of form rather than one of substance. Such a transformation should not occur in California.

**RICHARDSON, J.**—I respectfully dissent. I cannot join the present majority in their sudden and disquieting deviation from the clearly applicable decision of the United States Supreme Court in *Harris v. New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] and in their reversal of our own recent decision in *People v. Nudd* (1974) 12 Cal.3d 204 [115 Cal.Rptr. 372, 524 P.2d 844]. Having not participated in the court's consideration of *Nudd,* I owe no particular allegiance to the rule therein adopted, but am convinced that *Nudd* was correctly decided.

In the matter before us defendant testified on direct examination at his murder trial that he went to the Pairis home to tell his wife Harriet that he was leaving town; that he brought a gun with him to give to Ray Ward; that Kathy Pairis started shooting at him, he felt pain and ran for the door, firing as he went; and that he did not learn until later that he had shot anyone. In his prior statement to the officers, however, defendant candidly admitted that he brought his gun in order to obtain money with which to leave town, and that when the shooting started, he ran across the room and shot both Kathy and Harriet in the head.

Under the rule announced by the present majority the jury are not permitted to learn of this contradictory statement in appraising defendant's credibility since the officers failed when taking defendant's statement to comply with the requirements enunciated in *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Not only does the new rule announced by the present majority directly conflict with *Harris,* but also with the rationale of two earlier United States Supreme Court cases, *Agnello v. United States* (1925) 269 U.S. 20 [70 L.Ed. 145, 46 S.Ct. 4, 51 A.L.R. 409], and *Walder v. United States* (1954) 347 U.S. 62 [98 L.Ed. 503, 74 S.Ct. 354]. Thus, even had *Harris* never been decided, the trial court followed applicable precedent in admitting the evidence for impeachment purposes only.

The issue before us is relatively narrow. Since *Harris* is squarely in point are we bound by it and, if not, is it either wise or necessary to reject it?

1. *Independent State Ground*

The majority, while initially arguing in extended fashion that the United States Supreme Court in *Harris* was not following its own appropriate precedents, finally concede that pursuing this form of analysis is hardly our function, and conclude by invoking the "independent state self-incrimination clause" contained in article I, section 15, of the California Constitution. While the conclusion appears only in a footnote the independent state ground is absolutely central to the majority's thesis, and leads them to declare that, notwithstanding the near identity of language in the federal and California Constitutions, "*Harris* is not persuasive authority in any state prosecution in California."

It is both readily apparent and significant that the self-incrimination clauses of the Fifth Amendment to the United States Constitution and of article I, section 15, of the state Constitution contain virtually identical language. Also, the Fourth Amendment and article I, section 13, of the state Constitution employ similar language in prohibiting unreasonable searches and seizures. The very obvious and substantial identity of *phrasing* in the two Constitutions strongly suggests to me the wisdom, insofar as possible, of identity of *interpretation* of those clauses. The same considerations of policy, need for uniformity and avoidance of confusion apply with equal force to the Fourth and Fifth Amendment protections contained in article I of our state Constitution.

These important factors of deference and of policy have been recently well expressed in Justice Clark's dissenting opinion in *People* v. *Norman* (1975) 14 Cal.3d 929, 940-941 [123 Cal.Rptr. 109, 538 P.2d 237], wherein he quotes the following language from Justice Thompson's Court of Appeal opinion in *Norman:* " 'The Fourth Amendment to the United States Constitution and article I, section 19 [now section 13] of the California Constitution are essentially identical in wording. [Fn. omitted.] Decisions of the United States Supreme Court construing constitutional phraseology are highly persuasive. [Citations.] . . . The persuasion of the United States Supreme Court decisions is particularly strong in the area of search and seizure and the exclusionary rule. California courts have for years spoken of the basis of the exclusionary rule as the Fourth Amendment. A sudden switch to a California ground to avoid the impact of federal high court decision invites the successful use of the initiative process to overrule the California decision with its concomitant harm to the prestige, influence, and function of the judicial branch of state

government. . . . The more courts feel free to adopt ground rules unpersuaded by contrary decisions of other courts, the greater the likelihood there is of uncertainty in those ground rules. The uncertainty is mitigated if proper deference is paid United States Supreme Court holdings. [¶] 'Thus, something more than personal disagreement by a majority of members of a state court with the decision of the United States high tribunal on search and seizure is required if the persuasion of that court is not to be followed. . . . [T]he state system should accept the interpretation of the United States Supreme Court of language in the federal Constitution as controlling of our interpretation of essentially identical language in the California Constitution unless conditions peculiar to California support a different meaning.' "

I believe the foregoing reasoning is eminently sound, equally applicable to self-incrimination language that is nearly identical in the two Constitutions, and that no special, unique, or distinctive California conditions exist which justify a departure from a general principle favoring uniformity. In my view, in the absence of very strong countervailing circumstances we should defer to the leadership of the nation's highest court in its interpretation of nearly identical constitutional language, rather than attempt to create a separate echelon of state constitutional interpretations to which we will advert whenever a majority of this court differ from a particular high court interpretation. The reason for the foregoing principle is that it promotes uniformity and harmony in an area of the law which peculiarly and uniquely requires them. The alternative required by the majority must inevitably lead to the growth of a shadow tier of dual constitutional interpretations state by state which, with temporal variances, will add complexity to an already complicated body of law.

The vagaries and uncertainties of constitutional interpretations, particularly in the Fourth and Fifth Amendment sectors of our criminal law, are the hard facts of life with which the general public, the courts, and law enforcement officials must grapple daily. This condition necessarily breeds uncertainty, confusion, and doubt. It will not be eased or allayed by a proliferation of multiple judicial interpretations of nearly identical language.

The case before us presents a classic example, in my opinion, of the fallacy of the majority approach. Here the majority propose to rely on and encourage development of a separate *California* self-incrimination privilege notwithstanding the near identity of language in the Fifth

Amendment to the federal Constitution and article I, section 15, of the California Constitution. The inevitable result is *two* rules or standards of interpretation of *single* constitutional language. Furthermore, the majority blithely ignore what has long been recognized, namely, that the privilege against self-incrimination is a *single common law privilege* which existed long before its incorporation into *either* the United States or California Constitution. (See 8 Wigmore, Evidence (1961) § 2251, p. 295.) On principle, even in situations of varying constitutional expressions of a single common law privilege uniform interpretation should normally be required and expected. As Professor Wigmore put it: "The variety of constitutional and statutory phrasing neither enlarges nor narrows the scope of the privilege as developed in the common law. . . . [T]he detailed rules are to be determined by the historical and logical requirements of the principle regardless of the specific words of the particular constitution, . . ." (*Id.,* § 2252, p. 326.) A fortiori, as in the matters before us when constitutional language approaches identity, the compulsion toward uniformity of interpretation should be even greater. That being so, on what basis do the majority hold that the language of our state Constitution should be construed in a different manner than the substantially identical language of the Fifth Amendment privilege as construed in *Harris*? What circumstance peculiar to California requires that we do so? I can think of none. The majority have suggested none.

The simple fact is that in the instant case there is in reality only *one* privilege long recognized by the common law, subsequently incorporated in the federal Constitution, and much later adopted in the California Constitution. Nonetheless, under the majority holding notwithstanding the fact that we have but *one* privilege expressed in almost identical language they insist on *multiple* interpretations. The logic of this approach totally escapes me. The transient exhilaration drawn from our assertion of an independent "California" rule in this area will, in my opinion, speedily pass and leave in residue an unnecessary compounding and multiplicity of constitutional rules that should, so far as possible, be simple, uniform, consistent, and cohesive. The majority's approach makes transparently clear that the vigor with which the newly discovered separate and independent state constitutional interpretations are asserted ebbs and flows depending upon the approval or rejection by the majority of the particular constitutional interpretation which, in a given case, emanates from the federal Supreme Court. This accordion-like effect, this divergence and convergence, though in a sense predictable with the shifting winds of judicial policy and personal predeliction, is not calculated to produce that kind of uniformity or harmony conducive to

the logical and uniform development of constitutional law. As a device of constitutional interpretation the majority approach is dubious and suspect. As an instrument of judicial policy it is illogical and unnecessary.

### 2. *The* Harris-Nudd *Rule*

Before proceeding to an analysis of the merits of *Harris-Nudd,* I emphasize the self-evident, overriding, paramount, and fundamental purpose of a trial itself—namely, the ascertainment of truth. As the oath binds every juror "truly" to try the matter and to render a verdict that is "true" so the testimony of every witness is given under oath or affirmation that what is said is "the truth, the whole truth and nothing but the truth." All of the procedural and substantive processes of law at every stage of litigation, civil and criminal, have an unspoken focus on this single and central inquiry—what and where is the truth? We have, in faithful adherence to fundamental protections, circumscribed this search for truth with safeguards rooted in our Constitutions and in our concepts of fairness. This is fundamental and it is proper. We do not subject a defendant charged with crime to the rack and screw though we might thereby ascertain the truth. We do not utilize involuntary confessions. We adhere to many other important restraints in the pursuit of the truth, but we never abandon the search.

The genesis of the exclusionary rule lies very near the intersection of the twin procedural functions—on the one hand "truth-ascertainment" and on the other, privilege protection enfolding a defendant charged with crime. The rule is a creature of the United States Supreme Court judicially declared in *Weeks* v. *United States* (1914) 232 U.S. 383 [58 L.Ed. 652, 34 S.Ct. 341]. Following *Weeks* in 1925, the Supreme Court in *Agnello* v. *United States, supra,* 269 U.S. 20, 35 [70 L.Ed. 145, 150], condemned an attempt by the prosecution to introduce illegally obtained evidence during improper cross-examination regarding defendant's prior knowledge of narcotics. The court strongly implied, however, that had defendant testified on direct examination regarding his lack of knowledge, that testimony could have been rebutted by reference to illegally obtained contraband.

Subsequently, in 1954, the Supreme Court held in *Walder* v. *United States, supra,* 347 U.S. 62, 66 [98 L.Ed. 503, 507-508], that a defendant's direct examination testimony opens the door to impeachment by the prosecution despite the fact that an illegal search and seizure had tainted

the impeaching evidence and barred its introduction as part of the People's case in chief. The underlying principles on which the United States Supreme Court relied in *Walder* are made abundantly clear in its own language: "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment." (p. 65 [98 L.Ed. p. 507].) The foregoing language may be, as the majority insist (*ante,* at p. 108) "well worn." It is also unanswered. Further, *Walder,* in amplification adds: "Take the present situation. Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt or possessed any narcotics. Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. *Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.*" (Italics added, fn. omitted.)

The full import of the Warren Court's foregoing language of 21 years ago is manifest. What it clearly meant was that while, on the one hand, tainted evidence may not be utilized by the prosecution's case in chief, on the other hand, no judicially constructed screen will be permitted to shield from the fact finder the contradictory impeaching testimony or physical evidence when defendant himself takes the stand and testifies directly contrary to the impeaching testimony or evidence.

Something very fundamental is involved at this point, whether the case presents Fourth or Fifth Amendment considerations. In the matter before us defendant is entitled to face a prosecution case against him stripped of any reference whatsoever to evidence obtained in violation of *Miranda.* The exclusionary rule mandates this result and I fully concur both in its propriety and in its effect. Must we in our search for truth, however, go the second mile and afford a defendant during his trial, additionally, with an impenetrable sanctuary, unavailable to all other witnesses, to which he may retreat enfolded with complete and continuing immunity from any disclosure that the evidence in question may

prove him a liar? What constitutional or policy consideration requires imposition of such a judicial artifice? I suggest, none. For it is at this point that the policy of procedural protection for defendant and the policy of full factual disclosure to the trier of fact must fall into a balance. Lines must be drawn, and conflicting factors carefully weighed, in affording a defendant appropriate procedural protections while at the same time assuring to the trier of fact, within limits, the fullest possible access to relevant material evidence.

The issue before us involves only a slight variant of a theme developed long ago. *Agnello* and *Walder* concerned the admissibility, for impeachment purposes of illegally obtained evidence. Here we are concerned, of course, with statements taken in violation of *Miranda* principles, again for the sole purpose of impeachment not for prosecutorial aid in its case in chief. Surely, the rationale of *Walder* is fully applicable to cases in which, as here, the defendant takes the witness stand on his own behalf and testifies to matters in conflict with his prior statements. Under these circumstances defendant should not be permitted to use a *Miranda* violation as "a shield against contradiction of his untruths." (*Walder*, p. 65 [98 L.Ed. p. 507].) In this situation as in *Walder*, ". . . there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." (*Id.*) Notwithstanding the foregoing clear language of *Walder*, the majority profess to find difficulty in applying *Walder* to impeachment by use of *Miranda* violated statements. They insist that the *Walder* language is merely "reiterating the primary rule of exclusion enunciated in *Agnello*, absent the peculiar and limited circumstances shown in *Walder* . . . ." I find no such limitation in meaning or purpose. To the contrary, it seems to me that the *Walder* language, reasonably read, is plain, simple, and unambiguous. It finds no valid public or private purpose is served by permitting a defendant to erect an "off limits" sign thus blocking and concealing the fact of defendant's perjury from all view of the searchers for truth. In summary, *Harris-Nudd* represents, in my opinion, no dramatic or unprecedented shift in direction either of the United States Supreme Court or of this court, but rather, the unfolding of a consistent and natural sequel to earlier precedents well founded in logic and public policy.

I turn now to the reasons advanced sequentially by the majority for abandoning *Harris-Nudd* and with deference suggest that neither singly nor in the aggregate are they persuasive.

It is argued, first, that the rule of total and complete exclusion of the perjured evidence will eliminate or reduce the necessity of litigating the issue of voluntariness of defendant's statements. There can be no doubt that the issue is resolved, but at what price and for what purpose? Reduced to its essentials, the argument stresses judicial convenience. We are to reject the rule adopted by the United States Supreme Court and by ourselves so very recently because we will not then have to determine if the statement in question is "voluntary." The majority emphasize our expression in *People* v. *Fioritto* (1968) 68 Cal.2d 714, 717 [68 Cal.Rptr. 817, 441 P.2d 625], describing "a principal objective of *Miranda*" as assuring a simple "precise manual" containing "a single, uncomplicated test" for determining coercion. The majority insist that the *Miranda* court adopted a simple "manual" for determining the presence or absence of coercion. However, the "manual" has been revised by its author. After *Miranda* came *Harris*. The surface appeal of "simplicity," if in fact a *Miranda* application is "simple," has yielded to a more logical accommodation of competing interests. With due respect, I suggest that judicial convenience is a very thin reed upon which to lean as a basis for requiring the exclusion for all purposes of perjured testimony. Further, the majority's view is unrealistic for it ignores the fact that, even assuming compliance with *Miranda,* the question of the voluntariness of the accused's statements is not eliminated but remains in every case. More importantly, of course, is the serious question whether we are going, at this juncture, to permit, as a policy, judicial convenience to take precedence over the ascertainment of the truth. I respectfully suggest that the majority's position at this point represents an unwarranted reversal of priorities in the scale of personal and societal interests locked into a criminal trial.

The majority place principal reliance and emphasis, however, on their belief in the inability of a jury to follow proper instructions limiting the jury's consideration of the evidence to impeachment of credibility rather than as substantive evidence of the charged crime. The majority find in *Harris-Nudd* a "considerable potential" of risk. Such a contention leads us deeply into a "never-never-land" of purest speculation. No empirical evidence can be marshalled either for or against the argument. It may be said, however, that such an additional burden adds no discernible weight to the difficulties already facing the average jury in following many instructions. It may equally be urged that the "gymnastics" envisioned by the majority are matched by the "acrobatics" imposed on any jury in comprehending instructions on numerous definitions of crimes, defenses, criminal intent, diminished capacity or, for example, the jury's consider-

ations of prior consistent or inconsistent statements. (See former CALJIC Nos. 2.13 and 2.14.) Indeed, this exact process, which the majority find fraught with such hazard, sometimes is statutorily mandated. For example, under Evidence Code section 355 when evidence is admitted as to one party or for one purpose, but inadmissible as to another party or purpose, if requested the court must instruct the jury as to the limited scope of the evidence. This principle has wide application in both civil and criminal trials, and has been a familiar and accepted trial procedure for years. (See, e.g., BAJI No. 2.05; Witkin, Cal. Evidence (2d ed. 1966) § 316, pp. 279-280.)

We have ourselves previously confronted this precise problem, trusted the discretion of the trial court, and found the difficulty not insurmountable. In *People* v. *Sweeney* (1960) 55 Cal.2d 27, 42 [9 Cal.Rptr. 793, 357 P.2d 1049], decided before the adoption of Evidence Code section 352, we explained: "This question of the admissibility of evidence for one purpose for which it is properly admissible, where the danger exists that it may be improperly considered by the jury for another purpose to establish which it is not admissible was given careful consideration in *Adkins* v. *Brett,* 184 Cal. 252 [193 P. 251]. The court in that case said at pages 258-259: [¶] 'The rule, then, is that the admissibility of such evidence as that under discussion, admissible because competent as to one point, is not destroyed by its incompetency as to other points which it yet logically tends to prove. The danger, however, of the jury misusing such evidence and giving it weight in determining the points as to which it is incompetent, is manifest. In such a situation, as Professor Wigmore puts it . . . "the only question can be what the proper means are for avoiding the risk of misusing the evidence." Answering this question, Professor Wigmore says: "It is uniformly conceded that the instruction [to the jury] of the court [that the evidence is competent only as proof of one point and must not be considered as proof of others] suffices for that purpose; and the better opinion is that the opponent of the evidence must ask for that instruction; otherwise he may be supposed to have waived it as unnecessary for his protection." [¶] 'The general correctness of this statement cannot be doubted. But we doubt if the learned author intended to say more than that the opponent of such evidence is always entitled to such an instruction for his protection, if he asks for it, and that generally it will suffice. But it is not difficult to imagine cases where it would not suffice, and the opponent could justly ask for more. The matter is largely one of discretion on the part of the trial judge.' . . . This rule of *Adkins* applies equally to criminal prosecutions and 'it is for the trial court in the exercise of its judicial discretion to determine whether

its (the evidence) probative value is outweighed by its possible prejudicial effect and to admit or exclude it accordingly . . . .' (*People* v. *McCaughan,* 49 Cal.2d 409, 421-422 [317 P.2d 974].)" (*Id.,* at p. 43; see also *People* v. *Burton* (1961) 55 Cal.2d 328, 348-350 [11 Cal.Rptr. 65, 359 P.2d 433].)

We have repeatedly expressed the view that we will assume a jury has followed the court's instructions and in the absence of some showing otherwise will not presume that it has not. I do not share the majority's sudden anxiety that adherence to *Harris* imposes unreasonable demands beyond the jury's capacity. To speculate as to the probability that in general a jury either does not understand or alternatively will not follow an instruction limiting its consideration of evidence as impeaching and affecting credibility only, seems to me clearly insufficient ground upon which to base so sweeping a rule as that which totally insulates a defendant's possible perjury.

The majority next conclude that adoption of *Harris-Nudd* will remove any incentive to comply with *Miranda* thus creating "irresistible pressures on law enforcement personnel to secure a confession." This familiar argument was considered and flatly and, in my view, properly rejected by the Supreme Court in *Harris* itself when it said: "The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief. [¶] Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. . . . [¶] The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (401 U.S. 222 at pp. 225-226 [28 L.Ed.2d 1 at pp. 4-5] [citations and fn. omitted; accord, *Oregon* v. *Hass* (1975) 420 U.S. 714, 722-724 (43 L.Ed.2d 570, 578, 95 S.Ct. 1215)].)

Furthermore, I do not think it is realistic to assume that on a large scale, law enforcement officers will, as speculated by the majority,

deliberately and intentionally violate *Miranda,* thus rendering wholly unusable the evidence thereby secured in their case in chief, in the hope that it will become available, in a more limited sense, by way of impeachment. Far more important to a criminal prosecutor is the building of the People's principal case by the gathering of proof against a defendant, rather than by the assembling of impeachment evidence which may never be used if defendant does not take the stand, or which under Evidence Code section 352 may be excluded even if defendant does take the stand.

The final argument advanced by the majority, paraphrased, is that by permitting use of the evidence to impeach we in some way impair our dignity by lending our aid to "dirty business." The validity of such an easy generalized assertion and the appropriate answer must be weighed with close attention to the specifics of the context from which the majority's claim arises. A person is charged with crime. In the investigatory phases of the case, testimonial or physical evidence is uncovered as a result of conduct violative of *Miranda.* The evidence must be and is excluded in its entirety from the People's case in chief. The fact finder never learns of its existence. When, however, defendant takes the stand and under oath makes statements which are subject to impeachment by available evidence obtained in violation of *Miranda,* may it fairly and reasonably be said that the court engages in "dirty business" by permitting, for this limited purpose, the trier of fact to learn of this evidence? I suggest that it could perhaps be argued with equal force that application of the present majority view which mandates concealment of perjured testimony from those charged under oath with the responsibility of discovering the truth may in itself constitute a form of "dirty business."

It is at this point, I believe, that we reach the crux of the issue and arrive at those honest disagreements which separate us. The difficult questions raised involve conflicting policy considerations. How are we to weigh in the balancing pans of justice the need to afford an accused defendant procedural safeguards and protections on the one hand, and the constant pursuit of "truth, the whole truth, and nothing but the truth" on the other? Where shall we draw the line? What weight, what value, shall we ascribe to each element? Are we to elevate one claim above the other, or are we to seek, if possible, an accommodation of both? My differences with the majority are relatively simple. They insist that for all purposes and in every circumstance evidence obtained in violation of *Miranda* v. *Arizona* is excluded. I would permit an

accommodation excluding the evidence in its entirety in the case in chief but permitting its use for impeachment purposes. I discern no constitutional or policy consideration which should deny the fact finder, on its trail of the truth, knowledge of the impeachment evidence. In my view this neither involves us in "dirty business," nor mandates our concealment of perjury, but rather constitutes a fair, balanced, reasoned comparison and evaluation of conflicting social and personal rights and policies.

So very soon after *Nudd* the present majority reverse directions and now propound an all-encompassing rule extending the California privilege against self-incrimination to preclude any use whatever of the evidence in question. In doing so they disregard diametrically contrary views of the United States Supreme Court, author of *Miranda* itself, which in terms both ringing and repeated, has expressed itself as accepting the necessity for reasonable limitations on its *Miranda* rule.

The majority's treatment of the reception of *Harris* by our sister states is most revealing. They find comfort in the fact that in 1971 the Supreme Court of Hawaii and in 1973 the Texas Court of Criminal Appeals have also declined to follow *Harris*. (In fairness I must note that my research discloses one additional state, Pennsylvania, by a 4-3 vote also refused to adopt the *Harris* rule.) (*Commonwealth* v. *Triplett* (1975) 348 Pa. 98 [341 A.2d 62].) They have also found that in 1971 the United States Court of Military Appeals in interpreting the requirement of the Manual for Courts Martial was unaffected by *Harris*. While I have great respect for the Supreme Courts of Hawaii and Pennsylvania, the Texas Court of Criminal Appeals, and the Court of Military Appeals in its construction of the Courts Martial Manual, I confess to an even greater bias toward the United States Supreme Court in its interpretation of the Fourth and Fifth Amendments to the United States Constitution, and its clear majority holding in *Harris,* which so recently we felt was controlling.

What the majority have failed to disclose, however, is that *Harris* has been adopted and approved by the vast majority of states which have considered the question. The dissenting opinion of Pennsylvania Chief Justice Jones in *Triplett, supra,* lists cases from *30* states (other than *Nudd* in California) which have either adopted *Harris* or cited it as controlling. (*Commonwealth* v. *Triplett, supra,* 341 A.2d 62 at p. 67, fn. 2.) These include Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska,

New Hampshire, New Jersey, North Carolina, North Dakota, Ohio, Oklahoma, Tennessee, Utah, Washington, and Wisconsin. I believe that at least three other states (Alabama, New York, and South Carolina) have also adopted the *Harris* rule in addition to the 30 listed in *Triplett.* (See *Roynica* v. *State* (1974) 54 Ala.App. 436 [309 So.2d 475, 482]; *People* v. *Fiore* (1974) 34 N.Y.2d 81 [356 N.Y.S.2d 38, 312 N.E.2d 174, 179]; and *State* v. *Mercado* (1974) 263 S.C. 304 [210 S.E.2d 459, 461].) Significantly, of the 33 states which have approved *Harris* at least 5 (Florida, Illinois, Indiana, Massachusetts and New Jersey) addressed and flatly rejected the principal thesis of the present majority that *state* constitutional provisions may be used to avoid *Harris.* (See *State* v. *Retherford* (Fla. 1972) 270 So.2d 363; *People* v. *Sturgis* (1974) 58 Ill.2d 211 [317 N.E.2d 545, 547]; *Johnson* v. *State* (1972) 258 Ind. 683 [284 N.E.2d 517, 520]; *Commonwealth* v. *Harris* (1973) 264 Mass. 236 [303 N.E.2d 115, 117]; *State* v. *Miller* (1975) 67 N.J. 229 [337 A.2d 36, 39].) One may seriously and fairly question the strength of a juridical light that is discerned by so few and invisible to so many.

In overwhelmingly turning aside the present majority's argument some of the expressions of our sister states are significant. For example, the New Jersey Supreme Court held that "We conclude that *Harris* as applied herein [statements used for impeachment only] is a valuable truth-finding mechanism which does not impinge on a defendant's federal *or state* constitutional rights." (*State* v. *Miller, supra,* at p. 39, italics added.) As stated by the Supreme Judicial Court of Massachusetts "Like most courts which have considered the point . . . we decline the invitation to adopt the reasoning of the dissenting justices in [*Harris*]." (*Commonwealth* v. *Harris, supra,* at p. 117.) Even in Pennsylvania, one of only three states on which the majority may rely the court was very closely divided, four justices declining to apply *Harris.* Justice Pomeroy while concurring in the judgment of reversal felt that *Harris* was factually distinguishable from *Triplett* and urged that it was unnecessary to reach the question whether or not to adopt the *Harris* rule. In doing so he used language, echoing Justice Thompson's opinion in *Norman, supra,* which to me is both pertinent and persuasive. *"The interests of uniformity in the development of basic principles of constitutional law involving, as in this case, rights which are expressed in identical terms in state and federal constitutions, together with the deference that is due the pronouncements of the Supreme Court of the United States, indicate that we should chart a separate course only where compelling reasons for doing so are advanced.* No such reasons have been presented in this case." (341 A.2d 62 at p. 66, fn. omitted, italics added.) Chief Justice Jones in dissent

amplified his criticism of *Triplett* saying, "The majority's holding will only lead to the perpetration of obvious lies in court. The prosecution has already been penalized in its case in chief, and there is no reason that our exclusionary rules should be used as a tool to defraud the fact finder at trial. I fear that the majority opinion puts the Court's imprimatur upon perjury." (*Id.,* at p. 67, fn. omitted.)

The present majority herein completely reverse the course so recently adopted by us. Unfortunately they pursue this new bearing when it is very apparent that the parade is marching in the other direction.

Nor do I find any more persuasive the majority's resort to academia. They point to one article and four student notes published during the period 1971-1973 as authority for the proposition that "academic reaction to *Harris* has in general been strongly critical." A more recent article by Professor John K. Kaplan, of the Stanford Law School, focuses on *The Limits of the Exclusionary Rule* ((1974) 26 Stan.L.Rev. 1027) and casts very serious doubts on the majority's conclusion. Professor Kaplan notes that neither *Miranda* nor the exclusionary rule itself are constitutional doctrine, but rather attempts to "protect values established in the Constitution." Accordingly, he argues, referring to the exclusionary rule, that ". . . its restriction is hardly a radical step. . . . [¶] . . . 'The exclusionary rule is merely one arbitrary point on a continuum between deterrence of illegal police activity and conviction of guilty persons. As a stopping point, it can be justified solely on the ground that it achieves a better balance between these twin goals than would other points. If another stopping point does the job better, it should replace the current exclusionary rule.' " As Professor Kaplan also observes, to suggest reasonable limits to the exclusionary· rule is not to tamper with sacred dogma. Rather it may well constitute the necessary "pruning" which will strengthen the rule's application in a more proper and restricted area. He concludes that both the value and costs of the rule in "utilitarian" terms are singularly unpersuasive, and the price of the rule in a "political sense" is so high as to "jeopardize its existence regardless of its presumed benefits." Properly noting that "one does not have to oppose fourth amendment values, however, in order to object to the exclusion of evidence," (p. 1038) Professor Kaplan suggests the wisdom of removing the exclusionary rule altogether from aggravated cases concluding that "the fact remains that the case for eliminating serious crimes from the coverage of the rule is a strong one." It will be recalled that in the instant case Disbrow is charged with two murders—the most serious of all offenses. Contrary to the majority, I think it not at all clear that academic

literature is "strongly critical" of reasonable limitations, of the *Harris* type, on the exclusionary rule. While remaining vigilant in the protection of an accused from untoward police conduct neither can we disregard, in maintaining a procedural balance, the constant and fundamental purpose of the trial itself, ascertainment of the truth.

In the final analysis resolution of the case reduces itself not alone to honest differences in opposing interpretations, but to opposing philosophies as well. The majority impose a flat rule of exclusion. I would elevate the People's interest in the fact finding process. I think it wholly inappropriate and unwise, save in most unusual situations, to compound the analytical process by creating a duplicate series of constitutional rules—federal and state. Furthermore, even were it wise to interpret the California constitutional language in a different manner the majority, while rejecting, have not answered the logic or the reasoning of the United States Supreme Court in *Harris* wherein it (in reliance on *Walder*) stated: "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. . . . The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (401 U.S. 222 at pp. 225-226 [28 L.Ed.2d 1 at pp. 4-5].) In this situation, as in *Walder* ". . . there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." (*Id.*)

Facing the problem anew courts might adopt one of three possible alternative positions. They might include the perjured testimony for all purposes whatever, whether by way of impeachment or as substantive evidence in the prosecution's case in chief. They might exclude the evidence for all purposes, as proposed by the majority. They might, as the federal Supreme Court in *Harris,* and as in *Nudd,* adopt the middle ground of excluding the challenged evidence in the prosecution's case in chief but permitting it for impeachment. It seems to me that the *Harris-Nudd* rule strikes a proper and reasonable balance between the pre-*Weeks* rule of unlimited admissibility, and the majority's proposal of total exclusion.

Finally, it is always important to bear in mind, of course, a statutory safety valve. Trial courts continue to maintain in both civil and criminal cases a broad discretion under Evidence Code section 352 to exclude evidence if the danger of prejudice substantially outweighs its probative

evidentiary value, thus affording defendant an additional protection. (See *People* v. *Pierce* (1969) 269 Cal.App.2d 193, 205 [75 Cal.Rptr. 257].)

I believe the present majority seriously err in declining to follow the ruling of the United States Supreme Court in *Harris,* in reversing our own very recent holding in *Nudd,* and in departing from a position adopted by so many of our sister states. Our task is to seek fairness and an even-handed and dispassionate resolution of the conflicting considerations raised by the issues herein. In these efforts we will do well to be reminded of, and reflect deeply upon, the sage admonition of a very great legal scholar, Justice Benjamin N. Cardozo who more than 40 years ago in *Snyder* v. *Massachusetts* (1934) 291 U.S. 97, 122 [78 L.Ed. 674, 687, 54 S.Ct. 330, 90 A.L.R. 575], insisted: "But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

I would affirm the judgment.

McComb, J., and Clark, J., concurred.

Respondent's petition for a rehearing was denied March 10, 1976, and the opinion was modified to read as printed above. McComb, J., Clark, J., and Richardson, J., were of the opinion that the petition should be granted.