374 A.2d 1323

**In re James SHARPE, Jr.**

**Appeal of Mary Elizabeth SHARPE.**

Superior Court of Pennsylvania.

Argued Sept. 16, 1976.

Decided June 29, 1977.

Charles C. Shainberg, Philadelphia, for appellant.

George R. Scioli, Philadelphia, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT, and SPAETH, JJ.

HOFFMAN, Judge:

This is an appeal from a finding that James Sharpe, Jr. is a deprived child. Appellant contends that there was insufficient evidence to support that finding.[1] We affirm the order of the lower court.

On February 19, 1976, appellant brought her 28 month old son, James, to St. Christopher's Hospital in Philadelphia, for treatment of a skin rash. After an examination by Dr. Rose Schneier, a resident in pediatrics, the child was admitted to the hospital for treatment. Dr. Schneier's initial examination revealed that the child's legs, arms, and abdomen were bright red with dry, flaky skin and scattered lesions. His legs were also puffy as a result of the rash. The child had an abrasion and some oozing blood at the urethra meatus.[2] The doctor further testified that the child exhibited remarkably poor hygiene. His hair was matted and dirty; his body was generally dirty and had a bad odor. The skin condition was diagnosed as chemical dermatitis. The child's filthy condition was considered a possible contributing element to the child's dermatitis with his own urine acting as the irritant.

During the child's three week stay at St. Christopher's Hospital, he underwent a variety of tests, one of which was a radiographic bone survey. The x-ray revealed diffuse undermineralization of the skeleton. This lack of minerals in the skeleton results in increased susceptibility to bone trauma. After determining that no bone disease was present, the doctor recommended a balanced diet accompanied by physical exercise.[3] The x-rays also revealed two healing fractures involving the base of the second and third

1. Appellant also contends that the Juvenile Act of December 6, 1972, P.L. 1464, No. 333, § 2; 11 P.S. § 50–102(4), is unconstitutional. Because appellant did not raise this issue in the lower court, we will not consider it on appeal. *Wiegand v. Wiegand*, 461 Pa. 482, 337 A.2d 256 (1975).

2. The opening of the urethra on the penis.

3. Lack of mobility is a cause of undermineralization.

metacarpals [4] in the right and left hands. As a result of these x-rays, the doctor contacted the Family Resources Center to report the case of suspected child abuse or neglect.

Dr. Schneier administered the Denver Developmental Test to James Sharpe. This is a standardized test used to assess the development of a child in social, verbal, fine motor and gross motor areas. Although James was 28 months old, he had only achieved the social and verbal level of a child less than one year old. Consistent with the results of this test the doctor noted that the child did not verbalize with words when he entered the hospital, but made distinctive, grunting sounds to indicate his desires. The two major causes of such a developmental lag are lack of intrinsic intellectual ability and social deprivation. Based upon the child's social and verbal progress in the hospital during his three week stay, Dr. Schneier stated her opinion that social deprivation played a significant part in the poor results of the Denver Test.

A social worker also testified on behalf of the Department of Public Welfare (DPW). The social worker, Mrs. Cardinale, stated that she visited Mrs. Sharpe, by appointment, in her home on February 26, 1976. She stated that the home was clean and well organized. Mrs. Cardinale asked Mrs. Sharpe if she could recall when and where James had sustained an injury to his hands which could have caused the fractures. Mrs. Sharpe replied that the child had fallen out of his crib two months earlier, and bruised his hand. The mother stated that the bruise only remained for a couple of hours, then disappeared. They did not seek any treatment for the injury, nor was any treatment ever given for the fractures. When Mrs. Cardinale asked Mrs. Sharpe why she had not sought medical care for the child such as immunizations, Mrs. Sharpe replied that she did not have time.

At the end of his stay in the hospital, James was temporarily committed to a foster home. On March 1, 1976, DPW filed a petition to have James declared a deprived child. At

4. Metacarpal bones are those that separate the wrist from the fingers.

the close of the hearing the lower court made a finding of deprivation. The court then scheduled a disposition hearing for the following week to allow DPW time to prepare a plan for the child.

At the second hearing, Mrs. Cardinale stated that the best plan would be to have the child attend the Ken-Crest Center. This Center provides a day program in which a prescriptive plan is prepared for each child. The Ken-Crest program contains a home management component which includes staff meetings with families on a weekly basis to discuss the child and develop programs for him. Transportation and hot lunches are provided. A vacancy in the program was scheduled to occur in early April. The lower court ordered that James remain in the temporary custody of DPW until the opening in the program occurred, at which time he was to be returned to his mother.

Appellant challenges the sufficiency of the evidence to support a finding of deprivation. In examining a child custody case, the scope of our review is quite broad, and while we cannot nullify the fact-finding of the hearing judge, we are not bound by a finding which has no competent evidence to support it. *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (filed March 29, 1976). "While it is true that the question of credibility in juvenile cases, as in all other cases, is for the judge hearing the case to decide, *Commonwealth ex rel. Meta v. Cinello*, 218 Pa.Super. 371, 280 A.2d 420 (1971), the record of the proceeding before the juvenile court must be legally and factually adequate to sustain the findings of fact and the order of the court. A record lacking such legal or factual basis requires a reversal. See *In re Weintraub*, 166 Pa.Super. 342, 71 A.2d 823 (1950)." *Helman Appeals*, 230 Pa.Super. 484, 491–492, 327 A.2d 163, 167 (1974).

The Juvenile Act[5] defines a deprived child as one who: "(i) is without proper parental care or control, subsist-

5. The Juvenile Act, Act of Dec. 6, 1972, P.L. 1464, No. 333, § 2, eff. in 60 days; 11 P.S. § 50–102.

ence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals; . . . " The Commonwealth must prove deprivation; and the standard of proof is mandated by the statute: "If the court finds from clear and convincing evidence that the child is deprived, the court shall proceed immediately or at a postponed hearing to make a proper disposition of the case."[6] Thus, the court may not take a child from the parents against their will except upon a showing by clear and convincing evidence that the child is deprived. As stated in *Rinker Appeal*, 180 Pa.Super. 143, 148, 117 A.2d 780, 783 (1955), "[i]t is a serious matter for the long arm of the state to reach into a home and snatch a child from its mother. It is a power which a government dedicated to freedom for the individual should exercise with extreme care, and only where the evidence clearly establishes its necessity. Yet, of course, there are cases where such authority must be exercised for the protection and welfare of children."

██ The lower court found clear and convincing evidence that James Sharpe was deprived. A review of all the evidence indicates that it was correct. The child exhibited severe chemical dermatitis upon his admission to St. Christopher's Hospital and his own filthy condition was a possible cause. He also had an unexplained abrasion and oozing blood at the urethra meatus. X-rays revealed two healing fractures of the base metacarpals of both the right and left hands of the child. Appellant offered no plausible explanation for the cause of these injuries or for her failure to seek treatment for them. The x-rays further revealed an undermineralization of the child's skeleton. Treatment consisted of providing the child with good nutrition and freedom of movement.

Additionally, the child could not communicate with words and his social and verbal developmental level was equivalent to that of a child of less than one year of age, whereas his chronological age was 28 months. In the doctor's opinion,

6. The Juvenile Act, supra; 11 P.S. § 50–320(c).

this lag was a result of social deprivation. Appellant offered no explanation for the child's developmental lag. She stated that she did not think it unusual that her 28-month-old son could not talk. It is clear that the evidence at trial amply supports the lower court's finding of deprivation.

■ After the finding of deprivation, the lower court proceeded to a disposition hearing the following week. The Juvenile Act provides that once a finding of deprivation has been made, "the court may make any of the following orders of disposition best suited to the protection and physical, mental, and moral welfare of the child: (1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child. . . . "[7] Case law makes it clear that at a disposition hearing, after a finding of deprivation, the court should appraise the evidence according to the disposition best suited to the child's needs. *Matter of De Savage,* 241 Pa.Super. 174, 360 A.2d 237 (1976); *Stapleton v. Dauphin Co. Child Care Service,* 228 Pa.Super. 371, 324 A.2d 562 (1974).

In the instant case, the lower court determined that the child should remain with his mother, provided that he enter the Ken-Crest Center day care program. The lower court indicated that Mrs. Sharpe could not immediately regain custody of her child because she needed expert assistance to enable her to learn how to care properly for James. In this program specialists in child care and development will work with James and appellant. The staff will endeavor to teach appellant how to care for James. The Center will also provide an individualized prescriptive program for James to enable him to develop more quickly. The lower court clearly considered the needs of the child in its placement order.

Order affirmed.[8]

7. The Juvenile Act, supra; 11 P.S. § 50–321(a)(1).

8. We affirm only that part of the lower court's order which held that James Sharpe is a deprived child.

PRICE, J., concurs in the result.

SPAETH, J., files a concurring and dissenting opinion in which CERCONE, J., joins.

SPAETH, Judge, concurring and dissenting:

I agree with the majority that the lower court's finding that James is a deprived child [1] is supported by the evidence. Since the lower court's order is consistent with that finding, I join in the majority's affirmance of it. However, there is much more to this case than whether James is a deprived child; the lower court also found that he is an abused child,[2] and (by necessary implication) that his mother abused him. Although the mother, as appellant, has challenged that finding, the majority, without discussion, leaves it undisturbed, and from that action (or inaction) I dissent. In my opinion the mother is entitled to have the finding reversed. It does her great damage; it was made with no regard to due process; and it is unsupported by the record.

1

On March 1, 1976, the Department of Public Welfare filed with the Juvenile Branch of the Family Court Division of the Philadelphia Court of Common Pleas a petition that James be declared a deprived child. The "nature of the alleged deprivation" is described in the petition as "[a]buse or cruel treatment." In support of this allegation the petition states:

We are requesting the urgent temporary commitment of James Sharpe to the Department of Public Welfare. On 2/24/76, we received a report of suspected child abuse from St. Christopher's Hospital stating that James Sharpe was admitted on 2/19/76 in a filthy, unkempt condition with reddened, peeling skin. Skeletal survey revealed that his bones were brittle as a result of poor nutrition,

1. The Juvenile Act, Act of Dec. 6, 1972, P.L. 1464, No. 333, § 2, 11 P.S. § 50–102 (1976 Supp.)

2. The Child Protective Services Law, Act of Nov. 26, 1975, P.L. 438, No. 124, § 1, 11 P.S. § 2201 et seq. (1976 Supp.)

and there were old, healing fractures of the second and third metacarpals of the right hand, which in Dr. Schneier's opinion, were not sustained accidentally. Child is at a developmental level of six months, and it is felt that he is grossly neglected. Mrs. Sharpe has not visited the child in the hospital and stated that she "does not have time" to tend to his medical needs. When she learned of the filing of the CY–47, she threatened to remove James from the hospital. Dr. Schneier then secured a restraining order from Judge Cipriani on 2/25/76. We are concerned about the care which Mrs. Sharpe has provided for James, and about her ability to care for him, and her interest to improve her parenting. In light of the above, we recommend that the temporary custody of James Sharpe be urgently granted to the Department of Public Welfare.

On March 8, 1976, the lower court held a hearing on the petition. In support of the petition the Department of Public Welfare presented the testimony of Rose L. Schneier, a first year resident in pediatrics, who was the Dr. Schneier named in the petition, and Carolyn Cardinale, a social worker. Appellant testified against the petition. At the end of the hearing the court said:

THE COURT: Mrs. Sharpe, under all the circumstances of this case and all the evidence, I am going to make a finding at this time that the child is deprived. However, I am going to direct that the case be continued for one week, at which time the Department of Public Welfare is to present a plan.

Under the terms of that plan, I would want the child to be returned to you. It will be necessary, however, to implement the plan that is finally accepted.

Under the terms of the plan, I would expect that there be a provision where you will have an opportunity to sit and work with someone concerning the proper care of the child.

This is your first child, right?

MRS. SHARPE: Yes.

THE COURT: It is a new situation for you, and you may not have had the same opportunities that other people do or other young mothers do in order to find out what is the best thing to do.

In fact even those who know don't all the time know what are the best things to do. But nevertheless, we know that there are certain varieties and there are certain things that we should do.

All of us here are interested in the same objective that you are, and that is that we make certain that James gets the best possible treatment.

Now, James is suffering from some kind of a physical ailment, and I would assume that you might be interested —I'm sure you are—in correcting it.

Now, if correcting it means certain feeding or going to see the doctor for certain medication, and it may mean a number of times a week, that is going to be pretty hard for you to do. I would assume, however, that you are willing to do it. Are you?

MRS. SHARPE: Yes.

THE COURT: And it just means your cooperation. We are going to do everything we can to help you.

Now, your attorney will further explain to you any other questions you want answered, but we will be back here. The case will be continued for one week. (N.T. 86–88)

On March 15, 1976, the continued hearing was held. The hearing was informal, without sworn testimony. Ms. Cardinale described to the court the result of her efforts to develop a plan for James's care. She recommended that James be placed in Ken-Crest, a day care center, which would provide both a child development program designed to meet James's particular needs and a counseling program for appellant. The court asked appellant what she thought of this plan, and she replied, "It sounds pretty good" (N.T. 25), and "I'd like to do it" (N.T. 28). Ms. Cardinale said, however, that James could not be placed in Ken-Crest until the end of April. Through her attorney appellant argued to the

court that in the meantime James should be returned to her. In response, the court said, in part:

Well, according to the findings that we have here and the evidence that was presented at the last hearing, it appears that by acts of omission other than commission certain conditions occurred concerning the child that required the Court to make a finding that the child was deprived.

.    .    .    .    . .

Here is a child that has certain things that have happened to the child, and I think the testimony was fairly clear that the mother hadn't deliberately done these things. But evidently they were being done, and we are asking to correct the situation. (N.T. 13–14)

The court concluded by ordering that the commitment to the Department of Public Welfare was "to stand. The child is to be placed in Ken-Crest." (N.T. 25)[3]

Appellant's appeal from this order was argued before this court on September 16, 1976. On September 30 the lower court filed an opinion in response to the appeal. In the opinion the court opens its discussion of the case by saying that "[t]he following facts were used in the decision by this Court in its finding that James Sharpe, Jr. was deprived." (Slip Opinion at 1) After stating the facts, the court proceeds to discuss the Child Protective Services Law, concluding by saying that "such evidence establishes a prima facie case of child abuse" (Slip Opinion at 7; citation to the Act omitted), and that "[t]his Court would move to find James Sharpe, Jr., an 'abused child' under the Child Protective Services Act and thus deprived under the Juvenile Act" (Slip Opinion at 8). The court then proceeds "in the alternative"

---

3. Appellant's attorney asked the court, "[A]m I correct in my understanding that upon inception of the Ken-Crest program, the child is automatically to be returned to his mother, or are we to return to the court at the end of April for that?" (N.T. 29) The court, however, did not directly respond to this question, and the record therefore is unclear on the point. In its opinion, filed in response to appellant's appeal. the court states: "The child was therefore placed in the Ken-Crest Day Care and Child Development Program while remaining with his mother the remainder of the time." (Slip Opinion at 11)

(Slip Opinion at 8) to find James "deprived."  (Slip Opinion at 8–11)

On October 8, 1976, appellant's counsel filed a supplemental brief with this court, arguing that it was a denial of due process for the lower court to consider the Child Protective Services Law, and that in any case, the court's finding that James is an abused child is unsupported by the record.

## 2

The definition of an "abused child" under the Child Protective Services Law is

a child under 18 years of age who exhibits evidence of serious physical or mental injury not explained by the available medical history as being accidental, sexual abuse, or serious physical neglect, *if the injury, abuse or neglect has been caused by the acts or omissions of the child's parents or by a person responsible for the child's welfare* provided, however, no child shall be deemed to be physically or mentally abused for the sole reason he is in good faith being furnished treatment by spiritual means through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof or solely on the grounds of environmental factors which are beyond the control of the person responsible for the child's welfare such as inadequate housing, furnishings, income, clothing and medical care.  11 P.S. § 2203 (emphasis added).

Thus, a finding that a child is abused includes, and depends upon, a finding that the child's parent or other person responsible for the child is a child abuser.  This may also be seen in the provisions of the Law regarding evidence:

Evidence that a child has suffered serious physical injury, sexual abuse or serious physical neglect of such a nature as would ordinarily not be sustained or exist except by reason by [*sic*] the acts or omissions of the parent or other person responsible for the welfare of such child shall be prima facie evidence of child abuse by the parent or other person responsible for the child's welfare.  11 P.S. § 2222(3).

The consequences of a finding of child abuse are not limited only to the disposition of the child. The Child Protective Services Law provides that a "founded report" (a judicial adjudication based on a finding of child abuse, 11 P.S. § 2203) of child abuse shall result in a listing of the instance of abuse in a "[Statewide] central register of child abuse." The listing shall include the names of the subject of the report and their home addresses, the date and place of the abuse, and the age of the child. 11 P.S. § 2214(i). The record shall be maintained until the child is 18 years old. 11 P.S. § 2214(n). During that period the record is available to the "appropriate child protective service agency", which means the child abuse section of the particular county public welfare agency, for possible use in subsequent investigations of suspected abuse. 11 P.S. §§ 2214(f), 2203, 2216. The record is also available for use in a subsequent proceeding under the Juvenile Act. 11 P.S. § 50–335.

It is therefore apparent that by its finding that James is an abused child the lower court has done appellant great damage. Many would characterize a child abuser as one of the most despicable and unworthy persons in the community, others, as one of the most pitiful. It is reasonable to suppose that the reputation of anyone labeled by a court as a child abuser has been destroyed. Not only has appellant been so labeled, but she will be so labeled for 15 more years. In addition to destroying appellant's reputation, the label of child abuser may have a decisive effect in subsequent legal proceedings relating to her child, not to mention the effect it may have on the relationship between her and her child when he is old enough to understand what a child abuser is.

3

Given the damage to appellant, the lower court's action in characterizing her as a child abuser may not be upheld unless it conformed to the requirements of due process. The action cannot withstand this test, whether by "due process" one refers to the Due Process Clause of the Fourteenth Amendment of the United States Constitution or to Article 1, Section 1, of the Pennsylvania Constitution.

-a-

In *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the United States Supreme Court held invalid the application of a Wisconsin statute that provided that on complaint by designated persons, the state could forbid the sale or gift of intoxicating liquors to a person who because of "excessive drinking" exhibited certain character-istics, such as "expos[ing] himself or [his] family 'to want' . . .." The Court held:

[W]here the state attaches "a badge of infamy" to the citizen, due process comes into play.

.    .    .    .    .

Where a person's good name, reputation, honor, or integri-ty is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential. 400 U.S. at 437, 91 S.Ct. at 510.

Although the holding of *Constantineau* has been seriously eroded by subsequent decisions, it is still valid in the context of the present case.  In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Chiefs of Police of the City of Louisville and the County of Jefferson, Kentucky, had together compiled and published a list of what were termed to be "Active Shoplifters."  The list contained the names and photographs of several individuals, including the respon-dent's, although respondent had only once been arrested by a private security guard for shoplifting.  A few days after the list was sent to businessmen in the Louisville area, a court dismissed the charges against the respondent, who thereup-on filed an action under 42 U.S.C. § 1983, alleging that the listing had deprived him of a constitutionally protected right without due process and had been done "under color of state law."  The Court of Appeals for the Sixth Circuit held that the respondent had stated a cause of action, but the Su-preme Court, per REHNQUIST, J., reversed, BRENNAN, J., joined by MARSHALL, J. and in part by WHITE, J., dis-senting.  The majority of the Court distinguished *Constanti-neau* on the ground that there, not only had the state's action damaged reputation but "a right or status previously

recognized by state law was distinctly altered or extinguished," 424 U.S. at 711, 96 S.Ct. at 1165, *i. e.,* the right to purchase liquor. Since the attack on the respondent's reputation was not attended by any such deprivation of a state-recognized right or status, the majority said, listing him as a shoplifter, even falsely, did not call into play the requirements of due process.

This severe limitation of the coverage of due process does not exclude appellant in this case. Not only did she suffer damage to her reputation, she also suffered loss of the custody of her child—certainly a "right . . . previously recognized by state law. . . ." *In the Interest of Stephanie Clouse,* 244 Pa.Super. 396, 368 A.2d 780 (1976); *In the Interest of James and John LaRue,* 244 Pa. Super. 218, 366 A.2d 1271 (1976); *Matter of De Savage,* 241 Pa.Super. 174, 360 A.2d 237 (1976).

-b-

Even if it were found that a person's reputation is not protected under the Due Process Clause of the United States Constitution,[4] there is no doubt that reputation is constitutionally protected under our state law.[5] Article 1, Section 1,

**4.** There is language in one recent United States Supreme Court opinion that limits *Constantineau* even further. In *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the Court reviewed a police officer's claim that the allegedly false reasons for his dismissal from the force had damaged his reputation without due process. The Court per STEVENS, J., with BRENNAN, WHITE, MARSHALL and BLACKMUN, JJ., dissenting in separate opinions, declined to recognize the claim because the dismissal had been by a private statement to the officer. The Court held that subsequent legal proceedings could not convert the dismissal into a public statement. *See also, Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977).

**5.** Although the decisions of the United States Supreme Court are dispositive in defining rights under the federal Constitution, the state courts remain responsible to define and protect rights under the state Constitution. *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975). *See also People v. Disbrow,* 16 Cal.3d 101, 127 Cal.Rptr. 360, 545 P.2d 272 (1976); *State v. Johnson,* 68 N.J. 349, 346 A.2d 66 (1975). *State v. Santiago,* 53 Hawaii 254, 492 P.2d 657 (1971); *See*

of the Pennsylvania Constitution, entitled the "Inherent rights of mankind", provides:

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property *and reputation*, and of pursuing their own happiness. (Emphasis added)

And Article 1, Section 11, provides:

All courts shall be open; and *every man for an injury done him in his* lands, goods, person or *reputation shall have remedy by due course of law*, and right and justice administered without sale, denial, or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct. (Emphasis added)

Thus, "protection of one's reputation is a fundamental right classified with life, liberty and property," *Moyer v. Phillips*, 462 Pa. 395, 400, 341 A.2d 441, 443 (1975); *see also, Meas v. Johnson*, 185 Pa. 12, 39 A. 562 (1898), with the consequence that at least under state law, a person's reputation may not be damaged by acts of the government except by due process of law.

-c-

In a proceeding under the Juvenile Act, the focus is on the child; a major purpose of the Act is to "provide for the care, protection, and wholesome mental and physical development of the children coming within the provisions of this act." 11 P.S. § 50–101. There is nothing in the Juvenile Act itself to put a parent on guard that a proceeding under the Act might result in consequences to the parent such as those appellant has suffered. It is true that the Child Protective Services Law, authorizing those consequences, is implemented through proceedings under the Juvenile Act. 11 P.S. § 2208(c). However, notice to a parent that a hearing is to

*generally* Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv.L.Rev. 489, 498–502 (1977).

be held under the Juvenile Act is not sufficient if the proceeding is to apply the Child Protective Services Law.

This is not to say that a proceeding to determine whether a child is deprived may not also be used to determine whether the child is abused. In many cases, both may be at issue, and the same evidence may support either conclusion, or both. However, the difference in the consequences to the parent between a finding of deprivation and a finding of child abuse requires differing procedural safeguards. At a minimum, before a finding of child abuse may be made, a parent should be given notice reasonably likely to inform the parent that the proceeding is to determine whether the child is abused, and of the possible consequences of such a determination.[6] If the issues of deprivation and abuse are heard in the same proceeding, separate findings of fact should be made in reference to the abuse charge. If abuse is found, a separate disposition order relating to abuse should be given.

-d-

In the present case, the proceeding did not comply with due process in that appellant was not given any notice reasonably likely to inform her that she might be found a child abuser.

It is true that in the petition filed by the Department of Public Welfare it is alleged that the Department has "received a report of suspected child abuse," and also that the fractures of James's right hand "were not sustained accidentally" and that he was "grossly neglected." Nowhere, however, is it alleged that appellant had abused James. Instead, the petition states that the Department is "concerned about the care which [appellant] has provided for James, and about

6. The Pennsylvania Legislature has recently responded to the problem of abuse of children and adults in the home by enactment of the Protection From Abuse Act, Act of October 7, 1976, P.L. 1090, No. 218, § 1 *et seq.*, which provides a new set of remedies available to an abused person or one acting for an abused person. It is instructive to note that our Supreme Court quickly promulgated a new set of procedural rules to define the notice and hearing requirements of a proceeding under the Act. Pa.R.C.P. 1901–1905 (promulgated March 9, 1977).

her ability to care for him, and her interest to improve her parenting." These allegations might have been intended to state a case of child abuse, but they also might have been intended to state only a case of deprivation.

The hearing conducted on the petition was equally ambiguous. At no point did the attorney for the Department of Public Welfare state that a finding of child abuse was being sought. During the hearing, there were only oblique references to child abuse. It appeared from Dr. Schneier's testimony that she had filed a "CY–47." When the attorney for the Department asked her, "Well, CY–47 is a form of suspected child abuse?", the doctor replied, "Abuse or neglect." (N.T. 29) Ms. Cardinale, the social worker, opened her testimony by saying that the case had been referred to her as one of "suspected child abuse" (N.T. 48), but said no more about abuse. Finally, when appellant's attorney asked that the petition be dismissed for failure to "prov[e] by clear and convincing evidence that there is deprivation here" (N.T. 63), the attorney for the Department referred to "the new Act," although with no specific reference to child abuse.[7]

If a parent is to be charged with child abuse, the notice of the charge should be clearer than the notice given by the petition and hearing in this case. For purposes of decision, however, this lack of clarity may be overlooked; the principal failure of notice lay not with the petition or the manner in which the attorney for the Department of Public Welfare presented his evidence, but with the lower court.

The evidence will be more fully discussed in a moment; it is enough here to note that the gist of appellant's testimony was to deny all wrongful conduct with respect to her child. Following her testimony, and rebuttal testimony by Ms. Cardinale, the lower court announced that it was "going to

7. The attorney said:
   I believe under the new Act, injuries which are noticed by a physician, which are of the nature which a child is too young or the child could not inflict upon himself or herself, then the burden automatically shifts to the parents to explain the cause of these injuries. (N.T. 63–64)

make a finding at this time that the child is deprived."
(N.T. 86) There then ensued the colloquy between the court
and appellant that has been quoted in full above at pages 2
and 3. Nothing in this colloquy could have suggested either
to appellant or to her attorney that the court regarded, and
had found, appellant to be a child abuser. Quite the con-
trary was the case. Implicit in all the court said was a
finding that appellant had not abused her child but rather
that the child's condition had resulted from events or condi-
tions beyond appellant's control or for which she was not to
be blamed. Thus the court said:

> It is a new situation for you, and you may not have had
> the same opportunities that other people do or other
> young mothers do in order to find out what is the best
> thing to do.

> .    .    .    .    .

> Now, James is suffering from some kind of a physical
> ailment, and I would assume that you might be interested
> —I'm sure you are—in correcting it. (N.T. 87–88)

Nor was there anything in the continued, disposition hearing
to suggest that the lower court regarded appellant as a child
abuser. Again, quite the contrary was the case. The court
never said it had found appellant to be a child abuser.
Instead the court repeated its earlier finding of deprivation
(N.T. 13), and said, *inter alia*, that "[it thought] the testimo-
ny [at the first hearing] was fairly clear that the mother
hadn't deliberately done these things." (N.T. 14) In addi-
tion, the court expressed its disappointment that the pro-
posed plan "means a delay of one month for this mother not
to be able to be with her child," asking whether there was
"any other plan under the terms of which the mother would
be able to have her child earlier?" (N.T. 8) Finally, the
court by its disposition order approved a plan that contem-
plated appellant being with her child when he was not in the
day care center.

So far all of the lower court's actions were consistent with
James. being a deprived child, and inconsistent with him
being an abused child. It was not until after appellant had

appealed to this court, and had argued her appeal, that the lower court by its opinion stated that "[t]his Court would move to find James Sharpe, Jr. an 'abused child' . . . ." (Slip Opinion of lower court at 8.) This simply wasn't fair. It was a finding made without notice to appellant, and one that she and her attorney had no reason to anticipate would be made—indeed, as just discussed, they were entitled to anticipate it would not be made. For the court to characterize appellant as a child abuser, without notice to her, after the record was closed, in apparent contradiction of the record, and after the appeal had been filed and argued, represented a plain denial of appellant's right to due process.

4

Even if minimal procedural safeguards had been afforded appellant in this case I would find that the determination of child abuse by the lower court was unsupported by the record.

One cannot deny that James's condition, when he was taken to the hospital, was deplorable. I have no doubt that the finding that he was deprived was justifiable. It does not follow, however, that child abuse was proved.[8]

The only evidence offered by the Department of Public Welfare regarding James's physical and mental condition was the testimony of Dr. Schneier, who had examined him when he was taken to the hospital. The lower court specifically found that the doctor was not qualified to testify as an expert witness (because of her inexperience), although she was allowed to testify as to what she herself found and did. (N.T. 15) The doctor said she found undermineralization but she declined to offer an opinion either as to etiology or

8. At one point in its opinion the lower court indicated that a deprived child and an abused child are the same thing: ". . . this Court believes the terms are identical . . . ." (Slip Opinion at 4) Comparison of the definition of "deprived child" in the Juvenile Act, 11 P.S. § 50–102(4), and of "abused child" in the Child Protective Services Law, 11 P.S. § 2203, demonstrates that this is error. As the lower court notes later in its opinion, an abused child will be a deprived child. (Slip Opinion at 5) However, a deprived child may or may not be an abused child.

prognosis. (N.T. 25–26)[9] When asked "whether poor nutrition would be a possible cause of this type of situation?", she only replied, "It can be. It can be." (N.T. 27–28) She found healed fractures in the metacarpal bones, but was not allowed to say how she thought the fractures had happened. As to the cause of the skin condition, the doctor said, "[T]he possibility of it being urine was considered." (N.T. 20) As regards the child's ability to speak, when asked:

> Isn't it possible that he was just scared about being in a hospital and it took him that long to sort of loosen up and become comfortable in that environment?

She replied:

> There is a possibility certainly that that was the case. (N.T. 42)

Ms. Cardinale testified that she visited appellant in her home, and found it "clean and well organized, although it would seem to be very sparsely furnished." (N.T. 49) She went on to testify that appellant said she had taken James to the hospital because of his skin condition (N.T. 49), and had explained the fractures as having occurred

> about two months earlier at nighttime after she had put the child to sleep, the child fell out of his crib, and when she went to see what the problem was, when she heard the noise, she saw that the child's hand was swollen and bruised. (N.T. 50)

This evidence was not sufficient to show that James had suffered "injury, abuse or neglect . . . caused by the acts or omissions" of appellant. 11 P.S. § 2203. To the extent that it was sufficient to show anything about causation, it tended to show that given James's mineral deficiency (the cause of which was not shown), with consequent brittleness of his bones, he was more susceptible than other children to accidental fractures.

---

**9.** The majority in footnote 3 of its opinion says, "Lack of mobility is *a* cause of undermineralization." (Emphasis added.) As a general statement this may be true. However, there was no evidence that this was the cause of James's condition.

The order of the lower court should be affirmed on the basis that the evidence was sufficient to support the court's finding that James is a deprived child, and on the further basis that the order represents a reasonable disposition. The court's finding that James is an abused child should be set aside, both because of a failure of procedural due process and as unsupported by the record.

CERCONE, J., joins in this opinion.