468 A.2d 778

**In re James M. BARCLAY, Jr., Deborah Martin, Natural Parent.**

**Appeal of Deborah MARTIN.**

Superior Court of Pennsylvania.

Argued May 25, 1983.

Filed Nov. 10, 1983.

Marie Bittner, Pittsburgh, for appellant.

George R. Kepple, Kittanning, for Barclay, participating party.

Mark P. Cancilla, Pittsburgh, for Children, participating party.

Before CAVANAUGH, ROWLEY and CIRILLO, JJ.

CAVANAUGH, Judge:

In this case a petition was filed on November 7, 1980 to adjudicate James M. Barclay, Jr. a dependent under the Juvenile Act, Act of July 9, 1976, P.L. 586, No. 142, 42 Pa.C.S.A. § 6301 et seq. James was born on October 15, 1974, his parents being James M. Barclay and Deborah Martin and at the time of the petition he was approximately six years of age.[1] In order to consider the petition we must review the events that led up to its filing in what the court below characterized as a "pathetic and tragic case."

In September, 1980, the Allegheny County Children and Youth Services received a report of suspected child abuse from a hospital concerning Georgieanne Waltenbaugh, who was born on December 17, 1979. Deborah Martin is the mother of both James Barclay, Jr. and Georgieanne. The infant girl had extensive bruises on her body which the child's mother attributed to a fall down the stairs. Shortly thereafter Mercy Hospital in Pittsburgh reported that Georgieanne had suffered second degree burns over twenty-five per cent of her body, apparently as a result of being immersed in scalding water. All of this was brought to the attention of the court by the Allegheny County Children and Youth Services and Georgieanne was placed temporarily in the care of her stepfather's mother, Margaret Martin, pending an investigation. At this time Deborah Martin was married to Jonathan Martin, this being her third marriage

1. In order to clarify the relationships in this case the following should be noted. Deborah Martin as of the dates of the hearings in this case had been married three times and her husbands were, successively, James M. Barclay, James Waltenbaugh and Jonathan Martin. James M. Barclay was the father of James M. Barclay, Jr. Mrs. Martin refused to identify the father of Georgieanne Waltenbaugh, although it was not her second husband, James Waltenbaugh, whom she described as Georgieanne's legal father but not her biological father. Margaret Martin is the mother of Jonathan Martin and the stepgrandmother of Georgieanne Martin.

although she was only twenty-one years of age. A petition to have Georgieanne declared dependent was filed in Allegheny County, but prior to the hearing Deborah Martin, Jonathan Martin, and Margaret Martin, (Jonathan's mother) fled to California taking Georgieanne and James with them. The family assumed fictitious names in California. In order to avoid detection by the authorities while living there, Deborah Martin applied for a driver's license under the name of "Deborah Ann Linderman." The authorities located the family in California and returned them to Allegheny County where the three adults were incarcerated. Jonathan Martin committed suicide while in prison on November 6, 1980.

The petition in the instant case pertaining to James was filed on November 7, 1980 by the Allegheny County Children and Youth Services and a hearing was held before Novak, J. of the Court of Common Pleas, Family Division, of Allegheny County. The evidence established that Deborah Martin was first married at the age of fifteen to James Barclay who was the father of James Barclay, Jr. She was subsequently divorced and married James Waltenbaugh. In July, 1980, she divorced Mr. Waltenbaugh and married Jonathan Martin with whom she had been living for several months while married to Mr. Waltenbaugh. In the six years from Ms. Martin's first marriage she had lived in various places in Pennsylvania, Florida and California.

Deborah Martin had custody of both children from the time they were born until the dependency hearing and her parenting was characterized by her immaturity and lack of care for her children. After the apparent serious abuse suffered by Georgieanne at the hands of her stepfather, a social worker in Allegheny County suggested counselling. Although Mr. Martin agreed to this, Deborah refused such counselling. Subsequently Georgieanne and James were spirited off to California by Deborah and her husband. The evidence established that when the family was in California Mr. Martin administered excessive punishment to James. He also administered corporal punishment to Georgieanne.

No serious effort was made by Deborah Martin to protect her children from her husband.

Following the dependency proceedings James M. Barclay, Jr. was adjudicated a dependent. The case was then transferred to Armstrong County for disposition as James had been temporarily placed in the custody of his father, James Barclay, who resides in Armstrong County. A disposition hearing was held in Armstrong County on August 11, 1981. At that hearing James' father and stepmother, Diana Barclay, testified, as well as two clinical psychologists. Deborah Martin was present but did not testify. James was represented by separate counsel. The evidence established that James functioned in the "dull normal range" and will require specialized training. James did not express to the court a preference for living with either his mother or father, although he indicated to one of the psychologists, Pamela Olsen, that he would prefer to live with his mother. Ms. Olsen testified that she believed that James would be better off living with his mother and she especially did not feel comfortable with the strong emphasis that James' father and his wife placed on moral and religious values. Both James' father and his wife were very desirous of having custody of James. His father has been steadily employed for several years. The court, upon completion of the disposition proceedings, ordered custody to James' father and granted liberal visitation rights to his mother, Deborah Martin.

Initially we shall determine if James was properly adjudicated a dependent. The Juvenile Act defines a dependent child as follows at 42 Pa.C.S.A. § 6302:

**"Dependent child." A child who:**

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals;

The Act provides that the petition "may be brought by any person including a law enforcement officer." 42 Pa.C. S.A. § 6334. In this case it was brought by a case worker

for Allegheny County Children and Youth Services, a person properly authorized to bring the petition. We are aware that a dependency petition under the Juvenile Act is not an alternative way for a non-custodial parent to seek custody of a child. In *Interest of Theresa E.*, 287 Pa.Super. 162, 429 A.2d 1150 (1981). In this case the father did not file the dependency petition, although he would have been an appropriate person to do so. Notwithstanding that the ultimate result of the dependency proceeding was to award custody to the father, the action was properly brought in this case.

■ The Juvenile Act further requires that a finding of dependency be based on "clear and convincing evidence." 42 Pa.C.S.A. § 6302. In the case of *In re A.E.M.*, 288 Pa.Super. 284, 287, 288, 431 A.2d 1049, 1051, (1981) it is stated:

"Before interfering with a parent's care or control of a child and ordering the intervention of an agency of the state, a court must first determine that the child is dependent." *In the Interest of Theresa E.*, [287] Pa.Super. [162, 172], 429 A.2d 1150, 1155 (1981). *See* 42 Pa.C. S.A. § 6341(a). "[T]he fact of dependency must be proved by evidence that is 'clear and convincing.'" *In the Interest of Theresa E., supra,* 287 Pa.Superior Ct. at [172], 429 A.2d at 1155. *See* 42 Pa.C.S.A. § 6341(c). "[I]n determining whether a child is dependent, the hearing judge should not ask what are the child's 'best interests' but whether the child is presently without proper parental care and, if so, whether such care is immediately available." *In the Interest of Pernishek*, 268 Pa.Super. 447, 458, 408 A.2d 872, 877–78 (1979) (citing *In the Interest of LaRue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976)). *Accord, In the Interest of Theresa E., supra; In the Interest of Black*, 273 Pa.Super. 536, 417 A.2d 1178 (1980). A child who has been adjudicated dependent may not be separated from his parents unless such separation is clearly necessary. 42 Pa.C.S.A. § 6301(b)(3); *In the*

*Interest of Theresa E., supra; In re Donna W.,* [284] Pa.Super. [338], 425 A.2d 1132 (1981) (collecting cases).

Applying the above standards, there was clear and convincing evidence to support the adjudication of dependency. James resided continuously with his mother from the time of his birth until she was confined in the Allegheny County jail, shortly before the dependency proceedings commenced. In determining if James was a dependent child because he did not receive proper care or control, the hearing judge had to consider the sort of parental care or custody that he received in the past. In *Interest of Clouse,* 244 Pa.Super. 396, 368 A.2d 780 (1976). A determination of dependency may not be made in a vacuum, and the court below properly considered not only the extreme abuse that was suffered by James' half sister, but the lack of proper care for James as well. James and Georgieanne were part of the same household and their mother did little to protect either one of them. The record indicated that Jonathan Martin physically mistreated both James and Georgieanne in California, as well as physically abusing Georgieanne in Pennsylvania. Mrs. Martin described how her husband struck James and her daughter. There was evidence that James was beaten with a belt by his stepfather and that he used a paddle to strike him.

Mrs. Martin stated that she did not want to be "bothered" in California for what was going on in Allegheny County, namely the proceedings for child abuse based on her husband's allegedly scalding her infant daughter. She also willingly made the decision to move the family to California and testified as follows:

Q. Well, why did you choose to go?

A. Because I had been through two other previous marriages, and I couldn't—I was only married, like, two month to him, and I just can't end a marriage at two months.

Mrs. Martin clearly showed more interest in what she perceived to be her own welfare, than in James' welfare.

The court below carefully reviewed the evidence and made comprehensive findings of fact based on the evidence. James was represented at the hearing by separate counsel. The case of *In the Interest of Black,* 273 Pa.Super. 536, 417 A.2d 1178 (1980) dealt with the review of a finding that a child was a "deprived child," but the law is the same for reviewing a finding of dependency. "The reenactment of the Juvenile Act substitutes the term 'Dependent child' for 'Deprived child' but is defined using the same language as the original Act." *In the Interest of Black,* 273 Pa.Super. at 542 n. 3, 417 A.2d at 1181 n. 3. The court further stated at 273 Pa.Super. at 543, 417 A.2d at 1181, 1182:

The function of the trial judge and the standard of review to be employed by appellate courts in examining these cases has also been well defined. The hearing judge is to receive evidence from all interested parties and also from objective, disinterested witnesses. *In the Interest of Clouse, supra; In the Interest of LaRue, supra.* The child should be represented by separate counsel since his interest may be distinct from that of the parents. *Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 371, 324 A.2d 562 (1974). The inquiry of the hearing judge should be comprehensive and searching and should produce a decision supported by specific findings of fact and a full discussion of the evidence. *Tobias v. Tobias,* 248 Pa.Super. 168, 374 A.2d 1372 (1977); *In the Interest of Clouse, supra.*

If the hearing judge does not comply with these dictates, we will respond accordingly by remanding the case, for in custody cases the scope of our review is of the broadest nature, and we will not be bound by a finding that is not supported by competent evidence. *In re Custody of Neal,* 260 Pa.Super. 151, 393 A.2d 1057 (1978); *Helman Appeals,* 230 Pa.Super. 484, 327 A.2d 163 (1974). *If the hearing judge does comply, we must defer to his findings and accord them great weight because he has had the opportunity to see and hear the witnesses, In re Custody of Neal, supra; Clair Appeal,* 219 Pa.Super.

436, 281 A.2d 726 (1971), *and the question of credibility in juvenile cases, as in all other cases, is for the judge hearing the case to decide. In re Sharpe,* 248 Pa.Super. 74, 374 A.2d 1323 (1977); *Commonwealth ex rel. Meta v. Cinello,* 218 Pa.Super. 371, 280 A.2d 420 (1971). *The inability of the reviewing court to nullify the fact-finding of the hearing judge is the fundamental limitation of the broad scope of review of the appellate courts. See Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977). (Emphasis added).

While the scope of review in appeals of this nature is quite broad, we may not arbitrarily nullify the properly supported findings of fact of the hearing judge. In this case, we are satisfied that the adjudication of dependency was proper.

Once a child is declared dependent, the court then proceeds to the second stage or dispositional phase of the proceeding. In *Interest of Ryan Michael C.,* 294 Pa.Super. 417, 440 A.2d 535 (1982). This stage of the proceedings was held before President Judge House of the Court of Common Pleas of Armstrong County, as James' father resided in that county and he had been placed in his father's temporary custody. James' mother was present at the dispositional hearing but did not testify. James was represented by his own counsel. Testimony was presented by two clinical psychologists, Pamela Olsen, and Ralph Wilps, Ph.D. Dr. Wilps did not indicate which parent should be awarded custody but he did discuss the psychological problems that James had and his need of help. Ms. Olsen preferred that custody be awarded to the mother.[2] The

**2.** In Ms. Olsen's detailed report she states *inter alia:*
IMPRESSIONS: I felt that Jamey and Diana had prepared for my visit, and this communicated to me that they care. They are obviously making a concerted effort to provide an adequate home for Jimmy, and to impart to him a system of values and correct behavior. There is much to say for the consistency and stability that they have provided for him, and could continue to provide in the future. However, I felt that they are overly concerned with good and bad and with outside authority in a way that makes it difficult for Jimmy to develop his own morality, and therefore, his own personality, in

court below carefully examined the reports and testimony of Dr. Wilps and Ms. Olsen, but concluded after considering all the testimony, including that of James' father and step-mother, that his best interests would be served by awarding custody to James' father, with liberal visitation rights in the mother. Once a child is adjudicated dependent, custody will be awarded on the basis of what is in the child's best interest. *In re Donna W.*, 284 Pa.Super. 338, 425 A.2d

accordance with his own experiences and feelings. My sense is that Jimmy must look to them and please them in too many very specific ways. It is almost as if he should not even think about certain things (e.g., hate, anger, sexual fantasies), or decide for himself what kinds of traits he would like to develop in himself. I fear that he might give up thinking for himself or investing deeply in his own feelings and desires altogether, since along with the "good" feelings and thoughts come the bad, and these are unacceptable. Although this is an issue for any child, I think it might be of special importance to Jimmy, who is presented, by virtue of his parents different values and the many confusing experiences to which he has been exposed, with an especially difficult task of making sense of life and making choices about what kind of a person he wants to be.

Under recommendations she stated:

4. I personally feel more comfortable at the present time with Jimmy being returned to his mother to live. There are several reasons for this. First, I am not comfortable with the way in which they separated, which I feel must have been very confusing to and difficult for Jimmy. I believe that he needs to be there with her again on a daily basis in order to reestablish and rework his relationships with his mother and his sister. Secondly, I am more comfortable with the way in which Debby interacts with Jimmy at this point in his life. I feel that she can best provide him with a more open structure in which he can begin to sort out and express who he is as an individual. Finally, I feel that this is the option with which all four parties can most easily live. Jimmy has consistently communicated to his caseworker that he wishes to be with his mother. Additionally, I feel that Diana has been under quite a bit of stress in trying to deal with his many problems. Although Jamey would be disappointed by this decision, I feel that he could live with it because he understands the difficulty of Diana's position. This decision would be contingent upon Debby being able to maintain the stability that she presently demonstrates, and upon her being able to follow through on recommendations for psychotherapy and any educational recommendations put forth by Dr. Wilps.

5. Jamey and Diana should continue to maintain the positive relationship that they have developed with Jimmy. They clearly love him and have much to give him. Jimmy could continue to benefit from frequent involvement with them, preferably modified somewhat in accordance with recommendations one through three above.

6. The case should continue to be monitored by Children and Youth Services for a period of at least six months.

1132 (1981). The court was favorably impressed with the stable home environment that James would find in his father's home. The court did not overlook the traumatic experience that James had while residing with his mother and her three husbands, as well as the frequent uprooting of the family by moves to various places. His father had a history of long and steady employment and lived in a stable environment in a small town. The court was also favorably impressed with the stability of the home life that James was enjoying with his father and stepmother. His father stressed the importance of moral and religious principles. We note that Ms. Olsen objected to the fact that James' father and stepmother were "overly concerned with good and bad" and outside authority adding, peculiarly, that this would make it "difficult for Jimmy to develop his own morality." These were some of the factors that would have made her feel more comfortable had James been returned to his mother.

This type of case is most difficult for an appellate court which can be guided only by the printed record. The judges in two courts below saw and heard the witnesses, and we are not able to say that the order which awarded custody to the father with liberal temporary custody to the mother was incorrect.[3]

Order affirmed.

**3.** The order of the Court of Armstrong County also provided that James should remain under the protective supervision of the Armstrong County Children and Youth Services and that James' parents and the agency shall cooperate to address the child's potential learning disability and his needs for psychotherapy.