**In re MORGAN L., Born 2/6/95.**

**Appeal of KAREN L., Natural Mother.**

Superior Court of Pennsylvania.

Argued Oct. 8, 1997.

Filed Aug. 14, 1998.

Louis J. Kober, II, Greensburg, for appellant.

Thomas M. Kalinyak, Johnston, for Cambria County Children & Youth Services, participating party.

David C. Klementik, Windber, for natural father, participating party.

Before TAMILIA, POPOVICH and HESTER, JJ.

HESTER, Judge:

This is an appeal by the natural mother of Morgan L. from the March 25, 1997 order adjudicating Morgan, age two, dependent, and placing her in the custody of her father. We affirm.

Karen L., appellant ("Mother"), is the natural mother of Morgan, born February 6, 1995. Robert G. ("Father") is Morgan's natural father. Mother and Father have never married. Since the child's birth, Mother has had custody of Morgan and Father has had partial custody. There was a custody dispute that was resolved in January, 1997, wherein Mother had primary physical custody and Father had partial custody every other weekend from Saturday at 4:30 p.m. until Monday at 7:30 a.m. Notes of Testimony ("N.T."), 3/19/97, at 26.

In May, 1996, Mother contacted Cambria County Children and Youth Service ("CYS") complaining that Father did not properly care for Morgan during his periods of partial custody. Reproduced Record ("R.R.") at 29A. Originally, Mother's allegations concerned minor complaints relating to what Father fed Morgan and an alleged lack of supplies for the child. N.T., 2/24/97, at 66. However, beginning in August, 1996, and continuing through the time of the hearings, Mother alleged that Father was sexually abusing their child. *Id.* On six occasions from August, 1996, through January, 1997, Mother subjected Morgan to physical examinations for possible sexual abuse either in the emergency room or at her pediatrician's office. No evidence of sexual abuse ever was found; rather, physicians reported diaper rash or normal redness for a child of that age wearing diapers. Eventually, due to Mother's ongoing allegations in the face of a total lack of any supporting evidence, and subsequent to psychological evaluations of all of the parties, CYS filed a petition for dependency.

Hearings were held on February 24, 1997, and March 19, 1997. Both parents testified as did experts and various other witnesses. On March 25, 1997, the trial court determined that Morgan was a dependent child and further ordered that she be placed in the custody of Father. Mother appealed that order, and the trial court denied Mother's request for a stay of the March 25, 1997 order pending appeal.

On appeal to this court, Mother raises six issues which, generally, can be categorized in the following way: 1) whether the trial court erred in applying the imminent risk provision of the Child Protective Services Law to a dependency proceeding, 2) whether the trial court applied the proper standard for determining Morgan was a dependent child and whether the evidence supports such a finding, 3) whether the trial court erred in placing Morgan in the custody of Father, and 4) whether an adjudication of dependency can be supported where Father is a proper custodian.

■ Our standard of review in dependency cases is well-established.

The standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In the Matter of C.R.S.*, 696 A.2d 840, 843 (Pa.Super.1997), quoting *In re R.R.*, 455 Pa.Super. 1, 686 A.2d 1316, 1317 (1996).

We first address Mother's claim that the trial court erred in applying the imminent risk provision of the Child Protective Services Law ("Law"), 23 Pa.C.S. § 6303(b)(1)(iii), in the context of whether dependency was proven in this case. 23 Pa.C.S. § 6303(b)(1)(iii) states:

(1) The term **"child abuse"** shall mean any of the following:

. . . .

(iii) Any recent act, failure to act or series of such acts or failures to act by a perpetrator which creates an imminent risk of serious physical injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

Mother's claim presumably is based upon the following language in the trial court's March 25, 1997 order of dependency, "The Court finds that the mother's mental health condition of Factitious Disorder by Proxy results in imminent risk to the emotional and mental health of the child." In defending its application of the Law, the trial court stated the following:

[T]he Court reviewed the relevant provisions of both the Juvenile Act and the Child Protective Services Law. This review showed that the Juvenile Act has a purpose of providing protection of children and their wholesome mental development. 42 Pa.C.S.A. § 6301(1). This purpose is the guiding force behind the court's broad powers of discretion when acting pursuant to the Juvenile Act. *Matter of T.R.*, 445 Pa.Super. 553, 665 A.2d 1260 (1995). The Child Protective Services Law sets out that county and youth agencies can act pursuant to it to meet the needs of the family and children that may be at risk. 23 Pa.C.S.A. § 6302(b). Also, the Definitions Section of the Child Protective Services Law, 223 Pa.C.S.A. § 6302, when read in its entirety, shows the legislature intended this law to meet the compelling need of the Commonwealth to protect its children. Finally, this legislative intent is displayed in 23 Pa.C.S.A. § 6375(a)(2), it states that children and youth services have as an objective to "[p]revent abuse,

neglect and exploitation." Thus, the protection of children is to be both reactive and proactive. Protection is to be provided from all injuries resulting or potentially resulting from physical, sexual, or mental abuse. A child does not have to be physically injured or have their genitalia mutilated before the Commonwealth acts.

To stay true to the legislative intent of both statutes, the compelling need of the Commonwealth, and the spirit of both statutes, this Court read the imminent risk provision as intended to protect children of the Commonwealth that are in imminent risk of any serious injury.

Trial court opinion, 3/25/97, at 8–9 (footnote omitted).[1]

■ The Child Protective Services Law "was created primarily for reporting suspected child abuse, providing the means for doing so and establishing the persons responsible for reporting the abuse . . . ." *In the Interest of J.R.W.*, 428 Pa.Super. 597, 631 A.2d 1019, 1022 (1993). The Law does not provide for legal determinations of abuse; it is a vehicle for reporting abuse and invoking the involvement of county protective services for the child's care. *Id.* The Juvenile Act ("Act"), 42 Pa.C.S. § 6301 *et seq.*, on the other hand, is a procedural act which establishes jurisdiction in the courts to intervene legally "and make findings of dependency" which also may include child abuse. *In the Interest of J.R.W., supra*, 631 A.2d at 1022. In keeping with its purpose,

the Act provides a complete procedural vehicle by which children are taken into custody, investigations are made, petitions are filed, hearings are held and remedial work is done to aide the family to protect the child and, where necessary, to place the child out of the reach of abusive and neglecting parents. The Law and the Act must be read in pari materia.

*Id.*

We now examine the allegations of the CYS dependency petition:

This child is in danger of being emotionally harmed by her mother due to the ongo-

---

1. The trial court's opinion is not numbered; we     have cited to it as if it were numbered.

ing allegations of the natural mother. Specifically, this child's mother has continually accused the natural father of sexual abuse of this child. This child has been repeatedly questioned and repeatedly interviewed. Child has been repeatedly subjected to numerous sexual abuse examinations, which reveal no evidence of abuse. Child has also been assessed by psychologist and counselors. Mother has become obsessive in her belief of child being molested and has even photographed child's genitals. Psychological evaluation recommended counseling for this mother.

We are confident in concluding, while not stated in so many words, that all of the parties and the trial court were evaluating whether Morgan was an abused child and therefore could be a dependent child. Mother harbored a suspicion that Father was sexually abusing Morgan. For this reason, Mother continually subjected the child to physical examinations purportedly to substantiate the suspicion. Mother's actions, testimony established, resulted from her mental illness, Factitious Disorder by Proxy. N.T., 2/24/97, at 13–14. While CYS did not allege Mother abused the child explicitly, the evidence presented at the hearings coupled with relevant precedent which requires the Law and the Act to be read together, *see In the Interest of J.R.W.*, *supra*, led the trial court to evaluate the dependency issue in this manner.

Without a doubt, there was clear and convincing evidence offered at the hearings that Morgan was in imminent risk of child abuse by Mother through the threat of sexual exploitation. Dr. Grant Croyle, a licensed psychologist, testified on behalf of CYS. He performed a psychological evaluation of Mother on November 12, 1996, and conducted a follow-up visit on December 4, 1996. In his report, Dr. Croyle concluded:

[Mother] seems to have a long standing hysteroid personality. Consequently, under situations of stress, similar to what may transpire when custody and visitation issues are occurring, she may place unusual emphasis on physical events.

[Mother] also seems to have characteristics of an exhibitionistic fashion so herself [sic]

may be looking for affection or attention through inappropriate behaviors. She could be looking for events of a health nature in her child but also manipulating outcomes and visitation by seeking health problems in her child.

R.R. at 8A. As a result of these characteristics, Mother was diagnosed as having Factitious Disorder by Proxy, a mental illness. Dr. Croyle explained:

Factitious Disorder ... is a diagnosis that's rendered when physical, usually physical, complaints, are inconsistent with actual physical findings. Ordinarily this is a diagnosis that relates to individuals who may pursue various kinds of medical cares, can be very insistent that they have heart disorders or other kinds of physician disorders that are inconsistent. Factitious Disorder also can be rendered in terms of, in situations where a child might be involved or sometimes be called a victim or potential child victim, in which the psychological needs of a mother can be transferred upon another individual which can then create a situation that is sometimes called [Factitious] Disorder by proxy. And that means essentially that the disorder is transferred and the psychological work needs to be done by the parent, is being transferred to the child, and the child's disorder is brought to the forefront while the mother's would not be addressed properly.

N.T., 2/24/97, at 13–14. Dr. Croyle stated that if Mother does not receive rigorous therapy for this disorder, physical and emotional harm could occur to Morgan and that Factitious Disorder by Proxy "has historically proven to be a dangerous diagnosis." N.T., 2/24/97, at 21.

Dr. Croyle also opined that the nature and intensity of the type of physical examinations to which Mother subjected Morgan could cause physical and emotional harm. He stated:

In similar situations like this documented in literature, the worst case scenarios move from indications of a suspicion, now a normal redness being perceived as some sort of sexual abuse indicator, to perhaps invasive activities where actual physical characteristics or actual physical harm is

perpetrated by the individual who has the disorder, so that then actual findings are realized. In some cases there are indications where mothers provided medications, consequently result in physical symptoms that would mimic anything from diabetes to heart condition to whatever. In other situations there have been, in surrounding accusations of sexual abuse, there have been invasive materials placed in vaginal areas to cause scars or tears.

. . . .

· [T]he course [of the disorder] is unpredictable and one might say well it could stay fairly stable, if the needs are being met. In cases where confrontations have occurred, where the cries for help are not being heard, then symptoms may worsen in terms of harm to a child, symptoms would worsen.

N.T., 2/24/97, at 35–37.

CYS also presented clear and convincing evidence that Mother is not presently attempting to control her illness. Dr. Croyle, along with CYS recommendations, suggested that Mother receive intensive therapy once a week, which has not occurred. Dr. James Vizza, Mother's therapist, testified he saw Mother only six times between April, 1996, and February, 1997. *Id.* at 65. He further stated that Mother exaggerates situations and that she took her belief that Morgan was being abused "beyond the evidence." *Id.* at 70.

Julie Graboski, a clinical nurse specialist at Johnstown Pediatrics, also testified regarding the imminent risk of harm to Morgan. She stated that she saw Morgan on at least eight occasions since October, 1996, with most of the visits in the presence of Mother. *Id.* at 46, 53. Ms. Graboski testified that none of the behaviors identified by Mother were present in Morgan, *id.* at 47, and none of the behavioral changes in Morgan resulted from any actions by Father. *Id.* at 52.

In the instant case, the trial court was faced with clear and convincing evidence which pointed to an imminent risk of emotional harm and the clear potential for physical harm. The above testimony established that Mother needed psychiatric counseling for factitious disorder by proxy, had re-

peatedly subjected her daughter to physical examinations of her genitalia following visits with Father, that the visits revealed nothing more than diaper rash, that Morgan could suffer irreparable psychological harm relating to the constant examinations of her genitals, and that escalation of Mother's illness presented the possibility that Mother would cause physical harm to Morgan in order to substantiate her allegations against Father. *Id.* at 36.

■ We conclude that the trial court did not err in determining that Mother was unable to provide the proper parental care and control necessary for Morgan's physical, mental, or emotional health. Moreover, we believe the trial court correctly determined that Morgan is in imminent risk of harm due to the behavior and mental illness of Mother.

Since the evidence supports the conclusion that Morgan was without proper parental care while in the custody of Mother, the difficult question is whether the trial court was obligated to enter a finding of dependency before transferring custody to Father. Mother contends that the trial court erred in declaring Morgan to be a dependent child and then transferring custody of Morgan to Father. While Mother raises this issue with the caveat that there was insufficient evidence presented that she was incapable of providing proper care, which we previously addressed, she relies upon *In the Interest of Justin S.*, 375 Pa.Super. 88, 543 A.2d 1192 (1988), for support.

The trial court acknowledged *Justin S.* but opined that it conflicted with *In re Barclay*, 321 Pa.Super. 417, 468 A.2d 778 (1983), and it chose to follow *Barclay*. In *Barclay*, the juvenile court had found the minor child to be a dependent child while in the care and custody of the natural mother, an adjudication that this court affirmed. The court then transferred custody to the non-custodial father, again a finding we affirmed.

We cannot conclude the trial court erred in its determination. Where the evidence supports the finding that Morgan was without proper parental care or control while in Mother's custody, but such care and control was immediately available from Father, the

trial court did not err in determining Morgan was a dependent child. We quote with approval the trial court's reasoning and adopt it as our own:

> [T]here is sufficient evidence to find that the child is dependent. Also, [Father] has not objected and acquiesced to the declaration that his daughter is dependent. Implicit in the acquiescence of the natural father is that he agrees with this decision and further, would like his child, the mother of his child and himself to avail themselves of the rehabilitative treatment, supervision, and resources now available, for this is in the best interests of Morgan [L.], his daughter. [Father's] acquiescence and the Court's action is consistent with the findings of the Child Protective Services Law which provides that "abused children are in urgent need of an effective child protective service to prevent them from suffering further injury and impairment." 23 Pa.C.S. § 6302(a).
>
> . . . .
>
> To stay true to the mandates of the Juvenile Act, the Child Protective Services Law, and society, which maintain that it is necessary to preserve the integrity of the family and only interfere in the family unit when the welfare of the child is at stake, this Court placed the child with her natural father. Further, by this disposition, Morgan [L.], her mother, and her father may receive the rehabilitative services and supervision now available to them. This necessary therapy and supervision can be dispensed in a manner alleviating the imminent detrimental influence of [Mother's] behavior on Morgan [L.] This therapeutic treatment and supervision are consistent with the goal of someday allowing Morgan [L.] to be reared without the likely obstacles that are now forming in her future. If these obstacles are encountered, Morgan [L.] would have her emotional and mental health seriously harmed.
>
> Finally, the Court was placed in the unenviable position and under the tremendous burden of predicting the future of a child, at best this is an uncertain position. However, in the experience and best judgment of the Court, it is better to be conservative and protect Morgan [L.'s] future emotional and mental health and well-being than allow the child to face the peril associated with her mother's current behavior. Thus, this Court found by clear and convincing evidence that Morgan [L.] was a dependent child in imminent risk of serious emotional and mental harm and took the least restrictive measures to ensure her protection and provide the necessary services to the family.

Trial court opinion, 3/25/97, at 13, 15–16. As this determination is supported by competent evidence, it will not be disturbed.

The order of March 25, 1997, is affirmed.